**Daniel S. DECARLO, Plaintiff,**

v.

**ARCHIE COMIC PUBLICATIONS, INC., Defendant.**

**No. 00 Civ. 2344(LAK).**

United States District Court, S.D. New York.

Jan. 22, 2001.

Whitney North Seymour, Jr., Sharron Ash, Landy & Seymour, New York City, for Plaintiff.

Leora Herrmann, Edmund J. Ferdinand, III, Grimes & Battersby, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Daniel S. DeCarlo long has drawn the *She's Josie* comic strip, including the characters Josie, Melody and Pepper, for defendant Archie Comic Publications, Inc. ("ACP") and been compensated on a flat per-page rate and by certain royalties. Now that ACP is embarked on much more extensive and lucrative commercialization of these characters, including a motion picture, DeCarlo claims that he owns the characters and that ACP's commercialization exceeds the rights he granted to it.

The matter now is before the Court on DeCarlo's motions to remand the case to the state court from which it was removed and to disqualify ACP's attorneys and ACP's motion for summary judgment dismissing the complaint and granting their counterclaim, as well as DeCarlo's cross motion for summary judgment striking ACP's affirmative defenses and dismissing its counterclaim.

### *Facts*

#### *Plaintiff's Claim*

#### *The Start of the Relationship*

DeCarlo has been a comic book artist since the 1950's. He claims to have begun developing the character Josie in the mid 1950's at about which time he began working full time as a freelancer for a number of enterprises, including ACP for which he continues to work.[1] He contends that he showed a *Josie* comic strip, including the Melody and Pepper characters, which he claims also to have created, to ACP in or about 1961.[2] Following an unsuccessful effort to syndicate the proposed strip, ACP itself decided to publish it and brought out the first *She's Josie* comic book in 1963.[3]

It paid DeCarlo $23 per page for his work on the Josie comic books and, according to the complaint, paid him a 5 percent royalty on revenues earned therefrom from June 1966 through October 1969.[4] In addition, it sent him a check for $1,406.25 in 1998 without any explanation.[5]

#### *The 1988 Agreement*

On October 25, 1988, DeCarlo and ACP entered into a so-called Newsstand Comic Independent Contractor's Agreement (the "1988 Agreement"). The contract began with a series of recitals, including that

- ACP "is the publisher of comic strips and comic books ... of which [ACP] is the sole and exclusive owner,"

- ACP "seeks to supplement its own existing comic strips and comic books (hereinafter the 'Existing Archie Works') by the purchase of the entire right, title and interest in existing third party comic strips and pages for its comic books (hereinafter the 'Existing Third Party Works'),"

- ACP "desires to retain third parties to modify or otherwise work with the Existing Archie Works and/or the Existing Third Party Works ... on a work made for hire basis, to create modified comic strips and pages for its comic books (hereinafter the 'Modified Works')," and

- [T]he Contractor [i.e., DeCarlo] desires to confirm the assignment to [ACP] of the Contractor's entire right, title and interest in and to whatever comic strips and pages for comic books the Contractor may have heretofore provided [ACP] in furtherance of this project and further desires to work with [ACP] in the future under the

---

1.  Cpt ¶¶ 5–7.

2.  *Id.* ¶ 9.

3.  *Id.* ¶ 11.

4.  *Id.* ¶ 12–14. These payments allegedly were made pursuant to an oral agreement between the parties. *Id.*

5.  *Id.* ¶ 15.

terms and conditions hereinafter expressed."[6]

It then set forth covenants in relevant part as follows:

"1.   (a) The Contractor hereby assigns and conveys to [ACP] all of its rights, title and interest in the Existing Third Party Works heretofore submitted to [ACP].

"(b) The Contractor further agrees to work with [ACP] on a work for hire basis to:

"(i) create and develop for [ACP's] exclusive use Additional Works, and

"(ii) perform modifications of Existing Archie Works, Existing Third Party Works (including Existing Third Party Works of others) and Additional Works ..."[7]

\*      \*      \*      \*      \*      \*

"2.   (a) The Contractor hereby assigns to [ACP] all right, title and interest in and to all Works submitted under this Agreement as well as to any patent rights, copyrights, trademark rights and/or applications therefore which relate thereto.   The Contractor agrees to execute all documents which are reasonably required to perfect such assignment.   It is agreed and understood that such Works shall constitute Works Made for Hire and shall be the sole and exclusive property of [ACP]. To the extent any work of Contractor shall not be deemed under law to constitute subject matter which may be treated as work made on a Work Made for Hire basis, then Contractor hereby assigns and conveys to [ACP] all of its rights, title and interest in any such work.

"(b) The Contractor hereby expressly waives all claim of right which it may have to any ownership interest in such Works and/or the ARCHIE property."[8]

*The 1996 Agreement*

The 1996 Agreement is entitled a Work for Hire Agreement between DeCarlo and ACP. It began with a series of introductory recitals:

- ● ACP "is in the business of producing and/or publishing comic strips and comic books that include characters, artwork, stories, plots, trademarks, logos, and other creative expressions ('Properties'). All references to 'Properties' in this Agreement will include existing and future-created Properties that are commission by [ACP] and/or used in any of [ACP's] publications or licensed products."[9]

- ● "All past, pending and future uses of all Properties, including uses by [ACP's] licensees, will be collectively referred to in this Agreement as 'Works.'"[10]

The 1996 Agreement then set forth provisions defining the relationship of the parties, their understanding regarding compensation, and so on.   The key provisions included the following:

"5.   Contractor's full and complete compensation for each assignment ... will be a fixed sum based on a rate to be mutually agreed upon....   Contractor will not be entitled to royalties, to income derived from licensing or merchandising, or to additional compensation for the creation of new Properties...."

"19.   To the extent that any past, pending or future contributions by Contractor to the Works or Properties do not qualify as a Work for Hire, Contractor will and hereby does assign to [ACP] any right, title and interest that he/she has or may obtain therein, including all copyrights, patents, trademarks and other proprietary rights.   Contractor will sign, upon request, any documents need-

---

6.   Cpt Ex. B, at 1.

7.   *Id.* ¶ 1.

8.   *Id.* ¶ 2.

9.   Cpt Ex. C, ¶ 1.

10.   *Id.* ¶ 2.

ed to confirm that any specific Works or Properties are Works for Hire, to effectuate the assignment of his/her rights in any Works or Properties to [ACP] and/or to obtain copyright, trademark and/or patent protection for any of the Works or Properties."

*The Conduct of the Parties*

The foundations of plaintiff's position here are that he was the sole creator of the Josie strips and characters, that he granted to ACP only the right to use his drawings in its comic books and strips, and that plaintiff retains all other ownership interests in the characters Josie, Melody and Pepper. He alleges that ACP, in derogation of his retained rights, has licensed or otherwise used the Josie, Melody and Pepper characters for purposes other than comic strips and comic books—purposes such as dolls, recordings, animated cartoons and live action motion pictures—without his consent and without payment of fair and reasonable compensation.[11] Defendant disputes each of these propositions, but that is immaterial for present purposes.

DeCarlo admits having known for many years that ACP claimed rights in his alleged work product far more extensive than he now acknowledges having granted. He concedes, for example, that he understood in 1963 that Radio Comics, an ACP subsidiary, claimed sole ownership of the copyright in *She's Josie #1*, one of the comic books, and, indeed, that he "didn't think it was right" for it to have done so.[12] He knew that the creator credits on the covers of *Josie #22* (published in 1966) through *Josie and the Pussycats #47*

(published in 1970) with the exception of one issue read "by Dan 'n Dick," a reference to DeCarlo and Richard Goldwater of ACP, despite DeCarlo's contention that he was the sole creator of these characters.[13] Indeed, he knew that ACP licensed the *Josie* property to Hanna–Barbera for the production of animated programs that were telecast on CBS from 1970 to 1974 and that ACP, in his words, was "making a fortune" from the shows, yet DeCarlo neither received nor then demanded any additional compensation.[14] He knew also that ACP had authorized release of *Josie* cartoons on videocassette and licensed the production of *Josie* underwear.[15] Indeed, when he learned in 1993 that *Josie and the Pussycats* cartoons were being aired on The Cartoon Network, he was, in his words, "pretty much hardened. * * * They're doing anything they want with the show, the character. And they were."[16] Yet through this entire period, plaintiff concededly never voiced any discontent to ACP about its use of the Josie characters or asserted any of the claims of ownership he now asserts.[17]

In due course, ACP entered into negotiations with Universal City Studios with a view to licensing motion picture rights in the *Josie* property. Not surprisingly, particularly in view of DeCarlo's reticence over the decades, it acted on the premise that it owned the entire right, title and interest in it. When Universal inquired in 1998 whether DeCarlo ever had made any claim to ownership or co-ownership in the property, ACP truthfully responded that he had not. Indeed, based on DeCarlo's silence, ACP took the position that Univer-

11. *Id.* ¶ 20.

12. *See* DeCarlo Dep. 215; Def. 56.1 St. ¶ 14; Pl. 56.1 St. at 3.

13. *See* DeCarlo Dep. 178; Def. 56.1 St. ¶ 15; Pl. 56.1 St. at 3.

14. *See* DeCarlo Dep. 146, 197–202, 221–26; Goldwater Dep. at 89–90; Goldwater Dec. ¶ 11; Def. 56.1 St. ¶ 17; Pl. 56.1 St. at 3.

15. *See* DeCarlo Dep. 231–32, 261–62; Def. 56.1 St. ¶ 20; Pl. 56.1 St. at 3.

16. *See* DeCarlo Dep. 234–36; Def. 56.1 St. ¶ 21; Pl. 56.1 St. at 3.

17. *See* Def. 56.1 St. ¶ 23 (citing DeCarlo Dep. 73–74, 145–46, 148, 334–35, 178–79, 215–17, 219–20, 230–32, 236, 241–43, 311); Pl. 56.1 St. at 3.

sal's "concerns vis-a-vis the copyright issue ... are without any merit" and a "non-issue." Indeed, when it succeeded in licensing the motion picture rights, it relied upon DeCarlo's silence in agreeing to indemnify Universal against the consequences of any dispute that might arise as to ownership of the Josie characters.[18]

*Prior Proceedings*

Plaintiff commenced this action in New York Supreme Court, County of New York. The complaint contains five causes of action. The first sets forth no discernable legal theory, but alleges that DeCarlo created the Josie, Melody and Pepper characters, that the 1988 and 1996 Agreements were limited to comic strips and books, and that ACP is using or licensing the characters for additional purposes including motion pictures. It seeks a declaration that plaintiff is the sole owner of the characters and has the exclusive right to use or license them for purposes other than comic books and comic strips. The second claims that ACP has breached its oral and written contracts with plaintiff by failing to pay certain royalties and by licensing the characters for unauthorized uses. The third and fourth are substantially identical to the second, but seek relief for alleged breaches of an implied covenant of good faith and fair dealing and of fiduciary duty, respectively. Finally, the fifth cause of action seeks to impose a constructive trust on assets derived from the allegedly improper use of the characters. ACP has counterclaimed for breach of the 1996 Agreement, claiming that DeCarlo has breached a covenant precluding him from taking actions inconsistent with ACP's exclusive rights in the Works.

On March 28, 2000, ACP removed the action to this Court. It asserts that plaintiff's first cause of action in fact arises under the Copyright Act and therefore is within the exclusive jurisdiction of the federal courts. It contends also that the Court should exercise supplemental jurisdiction over the balance of the complaint. Plaintiff disputes defendant's jurisdictional theory, contending that entire action is grounded exclusively in the common law of New York. In addition, ACP has moved for summary judgment dismissing the complaint and awarding it judgment on its counterclaim.

*Discussion*

*I. Subject Matter Jurisdiction*

Section 1338(a) of the Judicial Code [19] confers jurisdiction on United States district courts "of any civil action arising under any Act of Congress relating to ... copyrights." ACP removed this action on the premise that plaintiff's first cause of action [20] arises under the Copyright Act of 1976.[21] DeCarlo moves to remand on the theory that the complaint does not invoke the Copyright Act and that there is no federal subject matter jurisdiction.

DeCarlo starts from the so-called "well pleaded complaint" rule—that the presence or absence of a claim arising under a federal statute ordinarily is determined from the face of the complaint—and from its corollaries, that the plaintiff is the master of its complaint and that federal question jurisdiction is not properly invoked on the basis of a federal defense to a state law claim.[22] As the first cause of action, he contends, rests solely on state law, the complaint raises no federal question. But

---

**18.** *See* Def. 56.1 St. ¶¶ 58, 60 (citing Silberkleit Exs. 13A, 15, 16; DeRosa–Grund Decl. ¶ 2).

**19.** 28 U.S.C. § 1338(a).

**20.** The second through fifth causes of action concededly do not arise under federal statutes and afford no basis for removal.

**21.** 17 U.S.C. § 101 *et seq.*

**22.** *See, e.g., Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Louisville & Nashville R.R. Co. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908); *Dukes v. U.S. Healthcare,* 57 F.3d 350, 353 (3d Cir.), *cert. denied,* 516 U.S. 1009, 116 S.Ct. 564, 133 L.Ed.2d 489 (1995).

DeCarlo overlooks the fact that "a plaintiff may not defeat removal by clothing a federal claim in state garb, or, as it is said, by use of 'artful pleading.' " [23] "If a plaintiff has pled what must necessarily be a federal claim, he has no state law available to choose as the basis for his suit." [24]

The essence of DeCarlo's claim is that he owns the Josie characters by virtue of state law, that he licensed them to ACP for limited purposes, and that he therefore has a state law claim for ACP's unlicensed uses. He rests his position on the premise that his "First Cause of Action ... is not, as defendant claims, brought under the Copyright Act, but under principles of equity enunciated by the New York Court of Appeals in the landmark case of *Fisher v. Star Co.* " [25] But the *Fisher* case [26] simply will not bear the weight that DeCarlo places upon it.

The plaintiff in *Fisher*, also a comic strip cartoonist, sued a newspaper publisher for printing purported versions of his comic strip drawn by another after its contract to publish the real thing had expired. *Fisher* held that this was tortious under New York unfair competition law on a "passing off" theory: Where "figures and names have been so connected with ... the originator or author, ... the use by another of new cartoons exploiting the characters ... would be unfair to the public and the plaintiff. No person should be permitted to pass off as his own the thoughts and works of another." [27] While the court did characterize the plaintiff as "the owner of the property right existing in the characters" and suggested that this right derived from his creation of them,[28] these comments were unnecessary to the result.[29] Indeed, if there were any doubt that authorship was the basis for relief in *Fisher*, it was laid to rest by *Gotham Music Service, Inc. v. Denton & Haskins Music Publishing Co.*[30]

The plaintiffs in *Gotham Music* revived an old, public domain song originally known as "Gambler's Blues," promoted it as "St. James' Infirmary," and turned it into a hit. A year latter, the defendant brought out the same tune under the title "St. James' Infirmary or Gambler's Blues" in the evident hope of "link[ing] both titles under one name so that a customer who called for either might be supplied" with defendant's music.[31] The plaintiffs obtained an injunction against the use of "St. James' Infirmary" in defendant's title, but the Court of Appeals reversed. In doing so, it distinguished *Fisher*—despite the fact that the plaintiffs had created the title "St. James' Infirmary"—because the title was associated with the music rather than with the plaintiffs as the authors of the music, and therefore "no question of imitation or deception or mistake arises." [32] *Gotham Music* therefore demonstrates that the basis of *Fisher* was the passing off

**23.** *Travelers Indem. Co. v. Sarkisian*, 794 F.2d 754, 758 (2d Cir.), *cert. denied*, 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986)

**24.** *Id.*

**25.** Pl. remand mem. at 12.

**26.** 231 N.Y. 414, 132 N.E. 133 (1921).

**27.** *Id.* at 433, 132 N.E. 133.

**28.** *Id.* at 432, 132 N.E. 133.

**29.** Unfair competition is a tort. 1 J. THOMAS McCARTHY, McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 1.8, at 1–15 (4th ed.2000); *see, e.g., Bonito Boats, Inc. v. Thunder Craft Boats,*

*Inc.*, 489 U.S. 141, 157, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). Insofar as it concerns passing off, the conduct at issue in *Fisher*, its rationale is the protection of consumer interests against deception—the portrayal of goods or services as products of a source other than those of their creator. *See generally, e.g., id.;* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 2 & comment (1995). The question whether the cartoonist enjoyed "property" rights in his drawings and, if so, the precise nature of those rights was immaterial to the decision in *Fisher*.

**30.** 259 N.Y. 86, 181 N.E. 57 (1932).

**31.** *Id.* at 89, 181 N.E. 57.

**32.** *Id.* at 90, 181 N.E. 57.

or deception as to the source of the comic strips, not a property right stemming from the plaintiff cartoonist's creation of the comic strip characters. If the basis of protection in *Fisher* had been some common law property right arising from the cartoonist's creation of the characters alone, then a similar common law property arising from the plaintiffs' creation of the title in *Gotham Music* should have led to precisely the opposite result in that case.

The fact that there is no basis in *Fisher* for DeCarlo's claimed state law cause of action is not necessarily dispositive of the jurisdictional issue. The question, after all, is whether he has asserted a claim that necessarily depends on federal law; the absence of a state law basis for it goes only part of the way toward resolving that issue. The determinative point lies in the 1976 Copyright Act.

Under the Copyright Act of 1909, federal copyright attached upon publication of a work with the requisite copyright notice.[33] Protection of literary property in unpublished works was left to state law.[34] Indeed, DeCarlo implies that his claimed rights derive from his original sketches of the Josie, Melody and Pepper characters, which never were published and which therefore were outside the scope of federal copyright protection at the time of their creation. The Copyright Act of 1976,[35] however, took a different approach. It provides that federal copyright protection attaches upon the fixation of a work in tangible form,[36] thus rendering publication immaterial for this purpose. It preempts state copyright law.[37] Moreover, the 1976 Act extinguished all common law copyright in unpublished works, although it provides that unpublished works created before January 1, 1978 are protected by federal law until December 31, 2002.[38] In consequence, if DeCarlo ever had any common law rights in these characters by virtue of his long unpublished original drawings, they were transformed by the 1976 Act into federally protected copyrights.

■ To be sure, "not every case involving federal copyright laws 'aris[es] under' those laws such that federal jurisdiction is proper ..."[39] For example, many cases involving contracts relating to copyrights raise subtle questions as to whether the "arising under" standard is satisfied. But, after some years of uncertainty in our circuit, the test now is clear: a claim arises under the Copyright Act if " '(1) the complaint is for a remedy expressly granted by the Act, e.g., a suit for infringement or for the statutory royalties for record reproduction ...' or (2) 'the complaint ... asserts a claim requiring construction of the Act....' "[40]

■ DeCarlo's first cause of action alleges that he is the creator of the Josie characters,[41] that he granted ACP certain rights to use them, and that ACP is using them to DeCarlo's detriment beyond the scope of the rights granted to it. He seeks a declaration that he "is the sole common law copyright for everything now protected at common law").

**33.** 17 U.S.C. § 10 (1976) (repealed 1978).

**34.** *See* 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 1.01[B], at 1–8 to 1–9 (2000) (hereinafter NIMMER).

**35.** 17 U.S.C. § 101 *et seq.*

**36.** *Id.* § 102(a).

**37.** *See* 17 U.S.C. § 301 (preempting state laws that create legal or equitable rights equivalent to any of the exclusive rights provided by § 106 of the Copyright Act).

**38.** 17 U.S.C. § 303. *See also* H.R. REP. No. 94–1476, 94th Cong., 2nd Sess. 139 (1976) (§ 303 intended "to substitute statutory for

**39.** *Berger v. Simon & Schuster*, 631 F.Supp. 915, 917 (S.D.N.Y.1986) (citing *T.B. Harms Co. v. Eliscu*, 339 F.2d 823 (2d Cir.1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965)).

**40.** *Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 349 (2d Cir.2000) (quoting *T.B. Harms Co.*, 339 F.2d at 828).

**41.** Cpt ¶¶ 5–7, 9, 22.

owner of the comic book characters Josie, Melody and Pepper, and has the exclusive right to use or license them for purposes other than comic strips and comic books," as well as an injunction against and an accounting for revenues derived from improper use by ACP.[42] Thus, it is authorship that forms plaintiff's only alleged basis for rights in the Josie characters. Since the effective date of the Copyright Act of 1976, the exclusive source of rights arising from authorship of a work fixed in tangible form is that statute.

Plaintiff's first cause of action thus satisfies both alternative prongs of the test that determines whether a claim arises under the Copyright Act. The relief he seeks—a declaration of ownership of the characters, an injunction against infringement of his claimed rights, and an accounting with respect to infringing uses—is that traditionally available under the Act in cases of copyright infringement.[43] Moreover, his claim of authorship—in a situation in which there are conflicting stories about exactly who did what in creating these characters and comic strips—will require construction of the Act's work-for-hire provisions, among other relevant sections.

Plaintiff nevertheless argues that his claim does not arise under the Copyright Act because comic strip characters are not susceptible of federal copyright protection. But he misconstrues the law. While the copyrightability of literary characters can present a troublesome question, "there has been no doubt that copyright protection is available for characters portrayed in cartoons. . . ."[44] This is so, explained one court, because the difficulties of distinguishing distinct attributes of a literary character from its embodiment of more general ideas and themes (the test for copyrightability offered by the Second Circuit in *Nichols v. Universal Pictures Corp.*[45]) do not arise, at least to the same degree, with visual images. "While many literary characters may embody little more than a protected idea, a comic book character, which has physical as well as conceptual qualities, is more likely to contain some unique elements of expression."[46] Such elements have been held to include "what the character thinks, feels, says and does and the descriptions conveyed by the author through the comments of other characters in the work," as well as "the visual perception . . . [which] tends to create a dominant impression. . . ."[47] Moreover, the protectible attributes in an animated character "extend . . . not merely to the physical appearance of the animated figure, but also to the manner in which it moves, acts and portrays a combination of . . . characteristics."[48] In consequence, DeCarlo's contention that cartoon characters are not protectible under the Copyright Act is, at best, a vast oversimplification.[49]

**42.** Cpt at 15–16.

**43.** 17 U.S.C. §§ 501–504.

**44.** *Warner Bros., Inc. v. American Broadcasting Companies, Inc.*, 720 F.2d 231, 240 (2d Cir.1983) (citing *Walt Disney Productions v. Air Pirates*, 581 F.2d 751 (9th Cir.), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979)); *Detective Comics v. Bruns Publications, Inc.*, 111 F.2d 432, 433–34 (2d Cir.1940); *King Features Syndicate v. Fleischer*, 299 F. 533 (2d Cir.1924); *Hill v. Whalen & Martell*, 220 F. 359 (S.D.N.Y.1914).

**45.** 45 F.2d 119 (2d Cir.), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931).

**46.** *Walt Disney Productions*, 581 F.2d at 755. *See generally* Note, *When Mickey Mouse Is As Strong As Superman: The Convergence of Intellectual Property Laws to Protect Fictional Literary and Pictorial Characters*, 44 STAN. L.REV. 623 (1992) (discussing cases and noting that "[i]n contrast to the plight of literary characters, pictorial characters had a far easier time receiving protection against unauthorized use because of their physical embodiment").

**47.** *Warner Bros., Inc.*, 720 F.2d at 240.

**48.** *United Artists Corp. v. Ford Motor Co.*, 483 F.Supp. 89, 91 (S.D.N.Y.1980).

**49.** Plaintiff relies upon a circular published by the U.S. Copyright Office that gives a general background on what aspects of cartoon strips and characters are eligible for federal

Plaintiff here has engaged in "artful pleading."[50] Plaintiff's first cause of action alleges ownership of the literary property in the characters and requests injunctive relief from defendant's creation of derivative works. The protection due owners of literary and pictorial works, such as the cartoon characters at issue here, is governed exclusively by the federal copyright laws. The relief plaintiff seeks is that customarily available in actions for infringement. The claim therefore arises under the Copyright Act. As the second through fifth claims derive from a common nucleus of operative fact, the Court will exercise supplemental jurisdiction over them.[51] Accordingly, the motion to remand for want of subject matter jurisdiction is denied.

## II. Defendant's Motion for Summary Judgment

Defendant moves for summary judgment dismissing all of plaintiff's claims and on its counterclaim for breach of the 1996 Agreement, which prohibits plaintiff from taking " 'any action inconsistent with or that limits or challenges Archie's exclusive right to exploit the Works.' "[52]

### A. Plaintiff's Ownership Claim

■ Plaintiff seeks a declaratory judgment that he is the creator and owner of the Josie characters.[53] He points to *Siegel*

---

copyright protection. It notes that cartoons and comic strips are protected by federal copyright, but that such protection "does not extend to the title or general theme for a cartoon or comic strip or to the general idea or name for the characters depicted." It goes on to say that "intangible attributes of characters are not copyrightable, but a drawing, picture or depiction ... of a character may be registered for copyright. However, copyright does not extend to the idea for the character itself."

This circular does not support plaintiff's position. DeCarlo does not claim ownership of the "general theme" or "idea" of a trio of female friends who have a rock and roll band. He claims ownership of the original unpublished renderings of the characters, including Josie's "unique bouffant hairstyle," as well as the spotted cat costume that inspired the development of the character's appearance as a "pussycat," and the right to make derivative works based on those renderings. *See* Cpt at ¶ 6. These elements are not "a mere delineation" of an idea or theme. They are, in fact, not necessary to the general theme of Josie at all; instead, they are distinct "pictorial and literary details [that] embody an arrangement of incidents and literary expressions original with the author, [and as such are] proper subjects of copyright." *Detective Comics*, 111 F.2d at 433–34.

**50.** *See Travelers Indemnity Co.*, 794 F.2d at 758.

**51.** 28 U.S.C. § 1367.

**52.** Def. mem. 34 (quoting 1996 Agreement ¶ 20).

**53.** Plaintiff asserts there are three levels of rights involved in this case: (1) "the underlying work," consisting of the original Josie sketches from which the comic strips were derived; (2) the illustrated comic book series; and (3) the comic book periodicals, a compilation of the illustrated series. He claims ownership of the underlying work and contends he never transferred those rights. He concedes that he transferred to ACP limited rights in the illustrated series in the 1988 and 1996 Agreements. He concedes that ACP has a valid copyright in the periodicals, though only as a compilation.

The basis for DeCarlos's claim to rights in the series is unclear. His brief states that "only one [level of rights] is factually disputed," and it is clear from the brief that plaintiff is referring to the dispute as to who created the original characters that form the "underlying work." But his attorney's declaration asserts that "the illustrated stories remained unquestioned as the separate property of Mr. DeCarlo ... independently for many years, until ACP claims they were transferred to ACP under agreements signed in 1988 and 1996." Seymour Decl. at 3. It is unclear whether plaintiff asserts independent ownership in the series or ownership based on his rights in the underlying work. If the former is the case, then it appears that plaintiff disputes that the illustrated series constituted a work made for hire. It is impossible to ascertain plaintiff's position in regard to this issue, as he has refused to make any arguments applicable to the copyright issues in this case.

*v. National Periodical Publications Inc.*[54] for the proposition that his original sketches are the works underlying defendant's later-published derivative works, e.g., the Josie comic books,[55] and asserts that he owns the characters as the creator of the original sketches. ACP, however, contends that plaintiff's claim to ownership is barred by the statute of limitations.

As discussed above, and assuming that DeCarlo in fact was the sole creator of these characters as he claims, he presumably enjoyed common law copyright in the unpublished original sketches prior to the 1978 effective date of the Copyright Act of 1976. At that time, however, the new Act preempted common law copyright and established federal protection for unpublished works, although Section 301(b)(2) preserved state law claims with respect to "any cause of action arising from undertakings commenced before January 1, 1978."[56]

■ Section 507(b) of the 1976 Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."[57] As the Second Circuit held in *Merchant v. Levy*, "[a] cause of action [for a declaration of copyright ownership] accrues when a plaintiff knows or has reason to know of the injury upon which the claim is premised."[58] Plaintiff here has known for many years that ACP claimed ownership of the Josie characters, including the rights to license motion pictures, merchandise, and other uses going well beyond comic strips and comic books. Indeed, DeCarlo testified at his deposition that he was well aware that ACP was "doing anything they want with the show, the character." Yet he did nothing until the commencement of this suit.

*Merchant* is closely in point. Plaintiffs there claimed to have co-authored the song "Why Do Fools Fall in Love" 1955. Frankie Lymon subsequently modified the song and made it a hit record of the 1950's, and did not list plaintiffs' names as authors on the Copyright. Plaintiffs were aware of Lymon's actions at the time. In 1987, plaintiffs sued those who owned the copyright, whose rights derived from Lymon, for a declaration that they were co-owners. But the Court of Appeals held that plaintiffs' ownership claim accrued in 1961, when they reached majority and were charged with knowledge of the competing claims, and that the claim to ownership therefore was barred by the statute of limitations:

> "We hold that plaintiffs claiming to be co-authors are time-barred three years

**54.** 508 F.2d 909 (2d Cir.1974).

**55.** *Siegel* held that the original renderings of the Superman cartoon character constituted the original works, later elaborations of which constituted derivative works. 508 F.2d at 914. *See also* 1 NIMMER § 5.03[B][1][b], at 5–31 n. 92.

**56.** 17 U.S.C. § 301(b)(2).

The extent to which DeCarlo's claims arise from pre–1978 "undertakings" within the meaning of Section 301(b)(2) is not entirely clear. Most courts have held that the "undertaking" in an infringement claim is the alleged infringement, not the creation of the underlying work. *See Hays v. Sony Corp. of Am.*, 847 F.2d 412, 415 (7th Cir.1988); *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F.Supp. 1523, 1531 (S.D.N.Y.1985). Where the claim is one of ownership the "undertaking" at least arguably would be the defendant's alleged

action in derogation of the plaintiff's ownership rights. *See Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir.), *cert. denied*, 519 U.S. 1108, 117 S.Ct. 943, 136 L.Ed.2d 833 (1997) (ownership or co-ownership claims accrue when the claim knows or has reason to know of injury caused by competing claim). But the precise meaning of "undertakings" here is immaterial. Even if DeCarlo retained a cause of action under state law for ACP's pre–1978 acts, that claim would be time-barred. *See* N.Y. CPLR § 214 (McKinney 1990) (three year statute of limitations for claims involving injury to property); *Christian Thee v. Parker Bros. Inc.*, No. 75 Civ. 1554(CPS), 1978 WL 950, at *4 (E.D.N.Y. March 7, 1978) (applying § 214's three year statute of limitations to common law copyright claims).

**57.** 17 U.S.C. § 507(b).

**58.** 92 F.3d 51, 56 (2nd Cir.1996).

after accrual of their claim from seeking a declaration of copyright co-ownership rights and any remedies that would flow from such a declaration. [citation omitted] Our conclusion promotes the principles of repose integral to a properly functioning copyright market." [59]

As there is no meaningful distinction between an action seeking a declaration of co-ownership and one seeking a declaration of sole ownership, the same result follows here. And the result is sound for the same reason—the interest in repose after all these years is compelling, particularly after DeCarlo silently watched ACP claim ownership in these characters literally for decades.

## B. The Remaining Claims

Plaintiff's remaining claims are for breach of contract, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing. He purports also to assert a claim for the imposition of a constructive trust, although that of course is a remedy rather than a cause of action. As previously noted, however, all of these claims rest on a single premise: that DeCarlo's original sketches are the works underlying all subsequent iterations of the Josie characters and that he owns those sketches and the literary property inherent in them. Everything else—such as the licensing of merchandise, animated cartoons and live-action motion pictures— he contends, is derivative of those sketches. Accordingly, he maintains that all of ACP's exploitation of the characters violated plaintiff's rights except to the extent that plaintiff licensed ACP's actions by the parties' agreements. [60]

Assuming *arguendo* that DeCarlo was the sole creator of the underlying sketches and characters, a proposition that defendant sharply disputes, there would be an interesting question as to whether the 1996 Agreement assigned his entire right, title and interest to ACP. [61] But it is unnecessary to resolve that issue, as defendant correctly contends that plaintiff is equita-

---

**59.** *Id.* at 56–57.

**60.** Cpt. ¶ 24.

**61.** Section 19 of the 1996 Agreement assigned to ACP any right, title and interest DeCarlo may have had in "any past, pending or future contributions by [DeCarlo] to the Works or Properties," including all copyrights and other proprietary rights. "Properties" was defined in the first sentence of the Agreement as "comic strips and comic books that include characters, artwork, stories, plots ... and other creative expressions" produced and/or published by ACP. The Agreement provided further that "references to 'Properties' ... will include existing and future-created Properties that are commissioned by [ACP] and/or used in any of [ACP''s] publications *or licensed products.*" (Emphasis added.) "Works" were defined as "[a]ll past, pending, and future uses of 'Properties.'" 1996 Agreement ¶¶ 1–2. Thus, the pivotal question is whether any rights DeCarlo had in the underlying sketches or the characters properly are characterized as "contributions" to the Works or Properties.

DeCarlo argues that the "Properties" referred to in paragraph 19 of the 1996 Agreement were solely comic books and comic strips and, in consequence, that his "contributions" to the "Properties" were limited only to the end-product drawings that ACP commissioned him to produce for publication. Thus, he would have the Court conclude that his original sketches and characters were not "contributions" to the "Properties" and therefore were not assigned to ACP.

DeCarlo's argument is difficult to reconcile with the fact that the Agreement defined "Properties" to include "licensed products." Plaintiff concedes that the "licensed products" include dolls, recordings, animated cartoons, and live-action motion pictures. Cpt. ¶ 23(b). The Agreement therefore implies that plaintiff made "contributions" to "licensed products." Those contributions of necessity could not be limited to the end-product comic strips he drew. They must include other aspects of the characters. Nevertheless, in view of the basis upon which the Court disposes of defendant's motion for summary judgment dismissing the complaint, it is unnecessary to determine whether the Agreement is sufficiently unequivocal to warrant a determination as a matter of law that plaintiff assigned any right, title and interest in the original sketches and characters to defendant or, instead, whether it is ambiguous and thus raises a genuine issue of fact.

bly estopped to pursue his remaining claims.

■ Equitable estoppel applies in both law and equity to deny a litigant "the right to plead or prove an otherwise important fact because of something he has done or omitted to do." [62] It applies in actions for breach of contract and fiduciary duty [63] as well as for copyright infringement–a fact that is significant here, as plaintiff's breach of contract action may well be preempted by the Copyright Act. [64] Whether applied to contract actions under New York law or copyright infringement actions under federal law, equitable estoppel requires proof that (1) plaintiff had knowledge of defendant's conduct; (2) plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions or (b) acted or failed to act in such a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment. [65]

■ The first element plainly is satisfied here, as DeCarlo indisputably knew that ACP conducted itself as if it owned the rights that DeCarlo now claims belong to him. He admits that in 1963 he read the copyright notice in *She's Josie # 1*, which claimed sole copyright in "cover and content" in ACP's subsidiary, Radio Comics. He admits that he understood in 1963 that Radio Comics, an ACP affiliate, claimed sole ownership of the copyright; he testified in fact that he "didn't think it was right" for it to do so. [66] He knew that the covers of Josie # 22 (published in 1966) through Josie and the Pussycats # 47 (published in 1970) bore the creator credit "by Dan 'n Dick", in reference to plaintiff and Richard Goldwater, then the managing editor and now co-owner of ACP. [67] He learned of ACP's license of the Josie property to Hanna–Barbera for the production of animated programs which aired on CBS from 1970 to 1974, and admits he knew ACP was "making a fortune" from the shows although he received no compensation. [68] He learned "a long time ago" that

**62.** *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Services,* 746 F.Supp. 320, 329 (S.D.N.Y.1990)

**63.** Plaintiff asserts breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty. Because the covenant of good faith and fair dealing stems from the contractual relationship, it is subsumed in the breach of contract claim for purposes of the equitable estoppel defense. The fiduciary duty between plaintiff and defendant stems, if at all, from the relationship borne of the Josie series. Because equitable estoppel is a defense founded on plaintiff's conduct in the relationship, it is a defense to the breach of fiduciary duty claim, as well, and the discussion of equitable estoppel here applied to both claims.

**64.** Where a claim for breach of contract fails to assert an "extra element" outside those necessary for a claim of copyright ownership or infringement, it "can serve as a subterfuge to control nothing other than reproduction, adaptation, distribution, etc., of works within the subject matter of copyright" and therefore is preempted by the Copyright Act. 1 Nimmer § 1.01[B][1][a], at 1–19 to 1–22. By parity of reasoning, the same principle extends to other theories of relief.

Here, the essence of plaintiff's second through fifth causes of action arguably is substantially identical to that of an infringement claim. As estoppel extends to these claims regardless of how they are characterized, however, there is no need to resolve the preemption issue.

**65.** *See Penguin Books U.S.A., Inc. v. new Christian Church of Full Endeavor, Ltd.,* No. 96 Civ. 4126(RWS), 2000 WL 1028634, at *17 (S.D.N.Y. July 25, 2000) (copyright infringement); *General Elec. Capital Corp. v. Armadora,* 37 F.3d 41, 45 (2d Cir.1994) (contract). *See also* 3 Nimmer § 13.07, at 13–133 n. 2 (contract actions for royalties). While the elements are worded slightly differently in infringement actions to account for the facts unique to such cases, the essential requirements are identical.

**66.** *See* DeCarlo Dep. at 215; Def. 56.1 St. ¶ 14; Pl. 56.1 St. at 3.

**67.** *See* DeCarlo Dep. at 178; Def. 56.1 St. ¶ 15; Pl. 56.1 St. at 3.

**68.** *See* DeCarlo Dep. at 146, 221–26; Def. 56.1 St. ¶ 17; Pl. 56.1 St. at 3.

some of the Josie cartoons had been released on videocassette and that there had been a Josie underwear license.[69] DeCarlo testified at his deposition that he "had heard some talk about 'Josie' merchandising ... maybe ten years ago."[70] He knew in 1993 that Josie and the Pussycats cartoons were being aired on The Cartoon Network, and testified in his deposition, "I was pretty much hardened at that point. This is it. They can do—They're doing anything they want with the show, the character. And they were."[71]

The second element of equitable estoppel also is present: DeCarlo conducted himself in a manner that gave ACP a right to believe it was intended to rely on his acquiescence in its actions. Silence or inaction in the face of an explicit contrary assumption by the opposing party may be sufficient to induce justifiable reliance by a defendant that a plaintiff will not later assert a claim.[72] Moreover, the "duty to speak need not be a purely legal one."[73] It is, instead, a duty of good faith: "[W]hen one party in a relationship with another has an opportunity to speak in order to avoid harm or injury to the other party and fails to do so to the ultimate prejudice of the other party, he will be estopped from relying thereafter on that relationship."[74] Finally, "it is immaterial to a claim of estoppel that there was no actual attempt to defraud or mislead."[75]

While there are cases to support the view that omissions rarely satisfy the elements of estoppel in copyright infringement actions, they do not control here. Unlike the defendants in *Merchant v. Lymon*,[76] defendant here was not "in the position to ascertain the extent of the competing claim."[77] Until filing this suit, plaintiff admits that he had never so much as voiced his discontent to ACP about its use of the Josie characters, or said anything to ACP regarding the existence of his alleged ownership rights or the alleged contractual obligations of ACP which he now asserts.[78] Plaintiff does not deny that he never complained to ACP or otherwise made it known to them that he claimed rights to the Josie characters; rather, he argues that ACP knew of his claim to the characters "from at least 1962 when it copyrighted *only* the comic book periodical

69. *See* DeCarlo Dep. at 231–32; Def. 56.1 St. ¶ 20; Pl. 56.1 St. at 3.

70. *See* DeCarlo Dep. at 261; Def. 56.1 St. ¶ 20; Pl. 56.1 St. at 3.

71. *See* DeCarlo Dep. at 234–36; Def. 56.1 St. ¶ 21 Pl. 56.1 St. at 3.

72. *See General Elec. Cap. Corp.*, 37 F.3d at 45–46 (defendant's silence in the face of plaintiff's assertion of its interpretation of contract provision falsely misrepresented defendant's intent to later challenge the interpretation, and induced plaintiff's reliance that defendant would not so challenge). *C.f. Merchant v. Lymon*, 828 F.Supp. 1048, 1064–65 (S.D.N.Y.1993), *rev'd on other grounds*, *Merchant v. Levy*, 92 F.3d 51 (2d Cir.) *cert. denied*, 519 U.S. 1108, 117 S.Ct. 943, 136 L.Ed.2d 833 (1997) (acknowledging silence and inaction may induce justifiable reliance by defendant in copyright infringement action that plaintiff would not pursue an infringement claim).

73. *CBS, Inc. v. Stokely–Van Camp, Inc.*, 522 F.2d 369 (2d Cir.1975) (citing *Simmons v. Westwood Apartments Co.*, 46 Misc.2d 1093, 261 N.Y.S.2d 736, 740 (N.Y.Sup.1965), *aff'd on other grounds*, 26 A.D.2d 764, 271 N.Y.S.2d 731, *leave to appeal denied*, 18 N.Y.2d 786, 275 N.Y.S.2d 271, 221 N.E.2d 811 (1966)).

74. *Id.* (internal citations omitted).

75. *Id.* (citing *Rothschild v. Title Guarantee & Trust Co.*, 204 N.Y. 458, 462, 97 N.E. 879 (1912)).

76. 828 F.Supp. 1048 (S.D.N.Y.1993).

77. *Id.* at 1064–1065. In *Merchant*, defendants not only knew of plaintiffs' claim to ownership of the copyright, but also attempted to conceal the royalties from plaintiffs and in part caused plaintiffs silence and inaction.

78. *See* Def. 56.1 St. ¶ 23 (citing DeCarlo Dep. at 73–74, 145–46, 148, 334–35, 178–79, 215–17, 219–20, 230–32, 236, 241–43, 311); Pl. 56.1 St. at 7.

as a 'composite work.' " [79] However, ACP's copyright notice on the Josie periodicals read "Cover and content protected by copyright throughout the world," indicating that ACP indeed did believe that it possessed the rights not only to the composite work but also to the individual works within it. The fact that plaintiff never attempted to register or renew a copyright in any work that included any Josie character would indicate to ACP that plaintiff had no claim to the Josie characters, or at least never intended to pursue such a claim. And plaintiff did nothing to refute that assumption. In short, DeCarlo's failure ever to voice a complaint or make a competing claim in the face of numerous opportunities to do so—not least, at the point where he signed the 1996 Agreement with which he was "very unhappy" [80]—gave ACP the right to rely on his silence. [81]

And rely defendant did—to its detriment. In connection with ACP's negotiations with Universal to license film rights in the *Josie* property, Universal in September 1998 asked ACP whether "DeCarlo ever made any claim to ownership or co-ownership to the property." ACP answered the question truthfully in the negative. Based on DeCarlo's silence throughout decades of ACP's use of the characters as well as two written agreements, ACP also took the position that Universal's "concerns vis-a-vis the copyright issue … are without any merit" and "a non-issue which is being over-lawyered." It decided not to investigate any potential claims to ownership DeCarlo might have had and urged Universal to execute the licensing agreements without further delay. Indeed, ACP agreed to indemnify Universal should any dispute arise as to ownership of the Josie characters. [82]

Finally, ACP plainly was ignorant of the facts now alleged by DeCarlo, i.e., that he claims ownership in the Josie characters.

In these circumstances, DeCarlo is equitably estopped from claiming that ACP has violated his rights in the Josie property and characters, whether those claims are couched in terms of copyright, contract or some other legal theory. Defendant is entitled to summary judgment dismissing the second through fifth causes of action.

### III. Defendant's Counterclaim

Defendant moves for summary judgment on its counterclaim for breach of paragraph 20 of the 1996 Agreement, which provides that "Contractor will not take any action that is inconsistent with or that limits or challenges Archie's exclusive right to exploit the Works and/or the Properties…." [83] Defendant claims that plaintiff's initiation of this action constituted a breach and requests damages in the form of attorneys' fees and litigation costs, as well as compensation for lost work of employees involved in this litigation. DeCarlo moves for summary judgment dismissing ACP's counterclaim.

Attorney's fees ordinarily "are incidents of litigation" and may not be recovered from the losing party absent an agreement between them, a statute, or a

---

**79.** Pl. 56.1 St. at 7.

**80.** *See* DeCarlo Dep. at 168–174.

**81.** Though a defense of equitable estoppel often raises issues of fact, *see Petrelli v. City of Mount Vernon,* 9 F.3d 250, 256 (2d Cir.1993), it does not always do so. If there is no evidence upon which a trier of fact reasonably could find for the plaintiff the issue may be decided upon a motion for summary judgment. *See id.* (citing *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986) (when "evidence is so one-sided … one party must prevail as a matter of law")). Courts, in fact, have decided the issue of justifiable reliance as a matter of law. *See City of New York v. Shalala,* 34 F.3d 1161, 1168 (2d Cir.1994); *Hospital Association of New York State, Inc. v. Toia,* 577 F.2d 790, 797 (2d Cir.1978).

**82.** *See* Def. 56.1 St. at 58,60 (citing Silberkleit Ex. 13A, 15, 16; DeRosa–Grund Decl. ¶2).

**83.** *See* 1996 Agreement ¶ 20.

rule.[84] Moreover, an agreement may not require indemnification for attorneys fees unless the intention to indemnify "is unmistakably clear from the language of the promise."[85] The same rules apply by analogy to the other litigation-related costs of which ACP requests recovery.

 The clause relied upon by ACP does not explicitly provide for indemnification of litigation costs; it states only that DeCarlo "will not take any action that is inconsistent with or that limits or challenges" ACP's rights to exploit the Works and/or Properties. The New York Court of Appeals has found language less vague than that here to be inexplicit for purposes of recovering attorneys fees.[86] Accordingly, this Court finds no basis under New York law for enforcing paragraph 20 of the 1996 agreement against DeCarlo by compelling him to pay ACP's legal fees.

### Conclusion

For the foregoing reasons, plaintiff's motion to remand the action to the New York State court for lack of subject matter jurisdiction is denied. Defendant's motion for summary judgment is granted to the extent that it seeks dismissal of the complaint. Insofar as it seeks judgment in favor of defendant on its counterclaim, the motion is denied. Plaintiff's cross motion for summary judgment striking ACP's defenses is denied, and its motion for summary judgment dismissing ACP's counterclaim is granted. In view of the disposition of these motions, plaintiff's motion to disqualify defendant's counsel is denied as moot.

SO ORDERED.

---

84. *Coastal Power Int'l, Ltd. v. Transcontinental Capital Corp.,* 10 F.Supp.2d 345, 370 (S.D.N.Y.1998) (quoting *Hooper Associates, Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 491, 549 N.Y.S.2d 365, 366 (1989)).

85. *Id.* at 492, 549 N.Y.S.2d at 367, 548 N.E.2d 903.

