ARCHIE COMIC PUBLICATIONS,
INC., Plaintiff,

v.

Josette Dumont DECARLO, Executrix
of the Estate of Daniel S.
DeCarlo, Defendant.

Archie Comic Publications,
Inc., Plaintiff,

v.

Josette Dumont DeCarlo, Executrix
of the Estate of Daniel S.
DeCarlo, Defendant.

No. 00 CIV. 5686(LAK).
02 CIV. 8466(LAK).

United States District Court,
S.D. New York.

April 23, 2003.

See also 11 Fed.Appx. 26.

Leora Herrmann, Edmund J. Ferdinand, III, Grimes & Battersby, LLP, for Plaintiff.

Whitney North Seymour, Jr., Landy & Seymour, for Defendant.

## MEMORANDUM OPINION

### (On Reconsideration)

KAPLAN, District Judge.

Plaintiff Archie Comic Publications, Inc. ("ACP") is a publisher of comic books including the well-known *Archie, Josie, Sabrina the Teenage Witch,* and *Cheryl Blossom* publications. The late Daniel S. DeCarlo was a comic book artist who did freelance work for ACP beginning in the early 1950s, contributed to the *Josie, Sabrina* and *Cheryl Blossom* properties, and in recent years began claiming ownership

rights in those properties. ACP seeks declaratory and injunctive relief, essentially to quiet its title to these properties against recent claims by DeCarlo's estate.

The matter now is before the Court on plaintiff's motion for summary judgment on its first through fifth claims for relief in No. 00 Civ. 5686.[1]

## I. Facts

### A. Defendant's Failure to Comply With Local Civ. R. 56.1

There is a preliminary matter that must be addressed before getting to the pertinent facts.

On a motion for summary judgment, the moving party bears the burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.[2] In considering such a motion, all facts and inferences reasonably drawn therefrom are construed in favor of the nonmoving party.[3]

Local Civil Rule 56.1 of this Court, which is substantially similar to antecedents that have been in effect for many years, provides in relevant part as follows:

"(a) Upon any motion for summary judgment . . ., there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

"(b) The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

"(c) All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

"(d) Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)."

The purpose of the rule "is to assist the Court in understanding the scope of the summary judgment motion by highlighting those facts which the parties contend are in dispute."[4] In the absence of the required statements, "the Court is forced to scour the record on its own in a search for evidence which may support that party's contention that a certain fact is not in dispute."[5]

■ In order for a Rule 56.1 statement in opposition to a motion for summary judgment to serve this purpose, it must respond appropriately to the movant's statement. Thus, "[a] proper Rule 56.1 statement submitted by a non-movant should consist of a paragraph-by-paragraph response to the movant's 56.1 statement, much like an answer to a complaint"

---

**1.** As it has withdrawn its sixth claim for relief, the motion seeks a disposition as to all of the remaining claims.

Subsequent to issuance of the Court's initial opinion in this matter, defendant agreed that this ruling is dispositive also of No. 02 Civ. 8466.

**2.** *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.,* 182 F.3d 157, 159 (2d Cir.1999).

**3.** *Id.*

**4.** *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP), 1999 WL 459813, at *1 n. 3 (S.D.N.Y. June 29, 1999). *Accord, e.g., Goldstick v. The Hartford, Inc.,* No. 00 Civ. 8577(LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug.19, 2002); *Fernandez v. DeLeno,* 71 F.Supp.2d 224, 227–28 (S.D.N.Y.1999).

**5.** *Rodriguez,* 1999 WL 459813, at *1 n. 3.

and must cite admissible evidence in support of the non-movant's contention that there is admissible evidence creating a genuine issue for trial.[6] And while it "is permissible for the non-movant to provide a separate statement, apart from this paragraph-by-paragraph response, in which it lists other facts it claims to be in dispute ... [,] this separate statement is *not* a substitute for the paragraph-by-paragraph response. The non-movant, particularly if represented by counsel, should not leave it to the Court to cull from this separate statement the pieces of evidence which would support the contentions of the non-movant asserted in its paragraph-by-paragraph response without citation." [7]

Defendant has ignored these requirements. Plaintiff submitted a detailed, 238–paragraph Rule 56.1 statement, each and every paragraph containing citations to the evidence upon which plaintiff relies for the asserted proposition. Defendant's responding statement, however, leaves the Court at sea as to the basis for defendant's contentions that there are genuine issues of material fact.

The section of defendant's Rule 56.1 statement that responds to ACP's statement contains three parts. The first lists the numbers of the paragraphs of ACP's statement that plaintiff does not dispute, which is entirely appropriate. The second is a list of 109 paragraph numbers which defendant disputes "on the grounds that they are variously inaccurate, misleading, irrelevant, hearsay, argumentative and/or incomplete." [8] It is utterly unsupported by any citations to the record, instead referring the Court to all of the transcripts and other sources cited by ACP "for an accurate presentation of the facts" although it must be noted that defendant's Rule 56.1 statement contains also a section, not directly responsive to ACP's statement, in which she asserts that certain enumerated propositions—many of which are conclusions of law and not factual assertions at all [9]—are disputed and includes some record citations. The third lists 78 paragraphs which, defendant contends, she cannot admit or deny "because they relate to transactions and discussions conducted out of [DeCarlo's] presence, without any participation, knowledge or consent on his part." [10]

■ This response is utterly insufficient.[11] To the extent that defendant de-

---

**6.** *Id.*

**7.** *Id.* (emphasis in original).

**8.** Def. 56.1 St. at 4, ¶ B.

**9.** For example, defendant contends that whether the original Josie and Sabrina depictions of the characters at issue were "works for hire," whether certain agreements transferred copyright ownership, whether a certain payment to DeCarlo resulted in a waiver, and whether the original depictions of the Sabrina characters were joint works subject to co-ownership all are disputed issues of fact. In most cases, she does not set forth the allegedly disputed evidentiary facts upon which she grounds her legal conclusions.

**10.** Def. 56.1 St. at 5, ¶ C.

**11.** *Sadler v. Moran Towing Corp.*, 204 F.Supp.2d 695, 696 (S.D.N.Y.2002) (response that failed to answer movant's statement "point by point" and to cite evidence in support of contention that factual issues existed insufficient); *Goldstick*, 2002 WL 1906029, at *1 (quoting *Rodriguez* ); *Evans v. Port Auth. of N.Y. and N.J.*, 192 F.Supp.2d 247, 251 (S.D.N.Y.2002) (same); *Fernandez*, 71 F.Supp.2d at 227–28 (same); *Rodriguez*, 1999 WL 459813, at *1 n. 3 (same); *Granoff v. Merrill Lynch & Co.*, 775 F.Supp. 621, 626 (S.D.N.Y.1991) (response consisting of questions insufficient; movant's statement deemed admitted), *aff'd*, 962 F.2d 2 (2d Cir.1992) (table); *see Baker v. Dorfman*, 239 F.3d 415, 422 (2d Cir.2000) (failure to respond to movant's statement results in facts there asserted being deemed admitted); *Gubitosi v. Kapica*, 154 F.3d 30, 31 n. 1 (2d Cir.1998) (per curiam)

nies the assertions of plaintiff's Rule 56.1 statement, she has declined to provide citations to the record supporting her claim that certain of the movant's statements of allegedly undisputed facts actually are disputed. She instead has left the Court to "scour the record on its own in a search for evidence ... that a certain fact is in dispute" and to seek "to cull from [her] separate statement the pieces of evidence which would support the contentions ... asserted in [her] paragraph-by-paragraph response without citation."[12] In substance, the Court is asked "to peruse a haystack looking for needles."[13] To the extent she denies the ability to admit or deny those assertions, her response also is insufficient because alleged inability to admit or deny is no excuse, at least in the absence of a sufficient Rule 56(f) affidavit, and none has been submitted here.[14]

As defendant has not submitted a sufficient Rule 56.1 statement, the facts set forth in ACP's statement are deemed established. In any case, the Court has reviewed the record and finds that the facts set forth below are undisputed, which

is not surprising in view of the fact that defendant has submitted in opposition to the motion only two brief declarations by percipient witnesses and one by her attorney. Thus, the result here would be the same even if the Court disregarded entirely the defendant's failure to comply with Rule 56.1.

## B. The Josie *Property and the Prior Litigation*

On March 8, 2000, DeCarlo sued ACP for a declaration that he owned the *Josie* property, including the related *Pepper* and *Melody* characters and, during the pendency of that action, sought in other ways to assert ownership of the *Josie* property.[15] On January 22, 2001, this Court ruled that DeCarlo's ownership claim arose under the Copyright Act, that it was barred by the statute of limitations, and that "DeCarlo is equitably estopped from claiming that ACP has violated his rights in the Josie property and characters, whether those claim are couched in terms of copyright, contract or some other legal theory."[16]

---

(same); *Carlton v. Interfaith Med. Ctr.*, 612 F.Supp. 118, 123 n. 4 (E.D.N.Y.1985) (failure to respond specifically to portion of movant's statement containing statistical evidence resulted in it being deemed admitted). *But cf. Dixie Yarns, Inc. v. Forman*, 906 F.Supp. 929, 934 (S.D.N.Y.1995) (failure to respond adequately to movant's statement "sloppy lawyering," but insufficiently abusive to deem all facts in movant's statement admitted); *United States v. Pilot Petroleum, Assoc., Inc.*, 122 F.R.D. 422, 422–23 (E.D.N.Y.1988) (same).

**12.** *Rodriguez*, 1999 WL 459813, *1 n. 3.

**13.** *Fernandez*, 71 F.Supp.2d at 227–28.

**14.** A non-movant who cannot provide admissible evidence in opposition to a motion for summary judgment may submit an affidavit pursuant to FED. R. CIV. P. 56(f) which, if it is sufficient, *see, e.g., Concourse Rehab. & Nursing Ctr., Inc. v. Whalen*, 249 F.3d 136, 146 n. 3 (2d Cir.2001); *Gurary v. Winehouse*, 190

F.3d 37, 43–44 (2d Cir.1999); *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995); *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137–38 (2d Cir.1994); *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir.1989); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985), will result in deferral of the motion pending discovery or in its denial.

**15.** ACP includes within the *Josie* "property" the original *Josie* comic strips and books as well as the *Josie and the Pussycats* stories and all of the stories, plots, characters and artwork that appeared therein. It uses analogous terminology with respect to *Sabrina* and *Cheryl Blossom*. *See* Second Supplemental Complaint ("Cpt.") ¶ 1. The Court follows suit.

**16.** *DeCarlo v. Archie Comic Publ'ns, Inc.*, 127 F.Supp.2d 497, 511 (S.D.N.Y.2001) ("*DeCarlo I*").

The decision was affirmed on appeal.[17] It therefore is unnecessary to set out the facts upon which it was based, although they are set forth in detail in the Court's prior opinion.[18] Nevertheless, DeCarlo has come forward with some new evidence which, he implicitly claims, avoids the issue preclusive effect of the prior decision with respect to equitable estoppel and demonstrates the existence of at least one genuine issue of material fact as to ACP's equitable estoppel theory as it relates to all the properties involved in this case. As the Court rejects this contention below, it is unnecessary to go into the facts concerning the *Josie* property.

## C. The Sabrina *Characters*

The concept of a teenage witch character was conceived of by current ACP co-owner Richard Goldwater ("Goldwater"), the son of ACP founder John Goldwater, in or before 1962.[19] According to Goldwater, he contacted a freelance writer, George Gladir, and asked him to write a story about "an attractive teenage witch."[20] Gladir obliged and was paid for the story. According to DeCarlo, this story was laid out in storyboard format like a rough sketch of a comic book story. The dialogue was written in balloons above the heads of stick figures drawn to represent the characters.[21] The story written by Gladir contained instructions as to how the story should be illustrated. It contained the character Sabrina (the teenage witch), as well as her "familiar," Salem, and the witch head Della.[22]

The first *Sabrina*-related artwork that DeCarlo turned in to Goldwater was published as the "Sabrina the Teen–Age Witch" story contained within *Madhouse # 22*.[23] The copyright notice in *Madhouse # 22* read "Copyright 1962 by Archie Comic Publication, Inc."[24] *Sabrina* stories appeared in ACP's *Madhouse* comics from July 1962 until August 1969.[25] During these years, *Sabrina* stories were separate from the *Archie* stories, that is, the characters did not interact and were not depicted as knowing each other.[26] Some of the *Sabrina* stories that were published in *Madhouse* were illustrated by DeCarlo, but ACP assigned the illustration work for many of them to other artists.[27]

On September 30, 1969, ACP introduced a new comic book series, *Archie's TV Laugh–Out Starring Sabrina the Teen–Age Witch* ("*Laugh–Out*"), that featured various ACP characters that then were appearing on the animated television series being produced by ACP and Filmation Enterprises.[28] Unlike the *Madhouse* stories, the television show featured Sabrina living with her aunts Hilda and Zelda and attending Riverdale High School with the *Archie* characters.[29] In consequence, John

---

17. *Id.,* 11 Fed.Appx. 26 (2d Cir.2001) (*"De-Carlo II"*), *cert. denied,* 534 U.S. 1056, 122 S.Ct. 647, 151 L.Ed.2d 564 (2001).

18. *DeCarlo I,* 127 F.Supp.2d at 499–502.

19. DeCarlo Dep. 2 at 67–70; Pl. 56.1 St. ¶ 8–11.

20. Pl. 56.1 St. ¶ 9.

21. DeCarlo Dep. 2 at 73–82.

22. Pl. 56.1 St. ¶ 10. A "familiar" is "in superstitious belief, a spirit, often in animal form, believed to act as a servant to a witch." Pl. Mem. at n.2 (quoting Webster's New World Dictionary (2d ed.1980)).

23. Pl. 56.1 St. ¶ 17.

24. DeCarlo Dep. 2 Ex. 2.

25. Pl. 56.1 St. ¶ 23(a).

26. *See id.* ¶ 23(b).

27. *Id.* ¶ 23(a).

28. *Id.* ¶ 23(c).

29. *Id.*

Goldwater instructed the artists hired by ACP to draw the *Sabrina* stories for *Laugh–Out* that they should feature Sabrina living with her aunts and as a classmate of the *Archie* characters.[30] The first issue of *Laugh–Out* featured two *Sabrina* stories, neither of which was illustrated by DeCarlo.[31]

In 1971, ACP began another new series, this one entitled *Sabrina the Teen–Age Witch*.[32] ACP published *Sabrina* stories in issues one through seventy seven of this series.[33] The "character likenesses" used in this series were "the same as those used in *Laugh–Out* and the Filmation cartoons."[34] DeCarlo was not one of the artists who regularly was assigned stories for the series.[35]

ACP created several other lines of *Sabrina* stories and published them in various series of comic books.[36] DeCarlo admits that he never wrote any of the *Sabrina* stories, had no authority to add or drop characters from *Sabrina* stories, and had no editorial control over the content of the stories.[37] He further admits that many artists other than himself were assigned to illustrate *Sabrina* stories and that he never contested this practice.[38]

In August 1994, ACP sold Viacom Productions, Inc. ("Viacom") an option on the live action theatrical and television motion picture rights, live action television and mini-series rights, and allied and ancillary rights in the "*Sabrina* series of characters as they currently appear in the comics published by [ACP], including, without limitation, the characters 'Sabrina,' 'Aunt Hilda,' and 'Aunt Zelda,' together with all content, titles, plots, story-lines, themes, concepts, 'look' and all other visual and print materials contained therein (collectively, 'the Work')."[39] ACP represented and warranted that it was the sole owner of the Work and that it was the sole and exclusive owner of all of the granted rights.

DeCarlo was not consulted in ACP's decision to enter into the agreement with Viacom, but he admits that he knew about the movie and made no attempts to find out what the movie said regarding ownership of the *Sabrina* properties because he was not "interested in it."[40] He explained that "[ACP] did other things before on this same thing and never told me about it, so this is not an exception."[41] He learned about the *Sabrina* live action television series before it was broadcast when, in July 1996, he prepared artwork for the cover of a new *Sabrina the Teenage Witch* comic book that incorporated a picture of the actress who was to play Sabrina on the series.[42] He admits also to watching the premiere of the series.[43] DeCarlo took no steps to assert his ownership rights after learning of the television show.[44] He fur-

**30.** *Id.*

**31.** *Id.* ¶ 23(d).

**32.** *Id.* ¶ 23(e).

**33.** *Id.*

**34.** *Id.*

**35.** Pl. 56.1 St. ¶ 23(e); *see* Def. 56.1 St. at 4, ¶ A.

**36.** *See* Pl. 56.1 St. ¶ 23(a)-(m).

**37.** This is specifically admitted by DeCarlo. Def. 56.1 St. at 4, ¶ A; Pl. 56.1 St. ¶ 25.

**38.** Pl. 56.1 St. ¶ 26; Def. 56.1 St. at 4, ¶ A.

**39.** Pl. 56.1 St. ¶ 59.

**40.** DeCarlo Dep. 2 at 273–77.

**41.** *Id.* at 275.

**42.** *Id.* at 278–79.

**43.** *Id.* at 279–80.

**44.** *Id.* at 281.

ther admits that he never asked ACP for a royalty on sales of *Sabrina* comic books or merchandise.[45]

As of his deposition on December 8, 2000, DeCarlo had never registered or renewed the copyrights in any works that included any of the *Sabrina* characters.[46]

### D. The Cheryl Blossom *Property*

Within the *Archie* universe, an eternal triangle involving Archie, Betty and Veronica has played itself out since the 1940s.[47] In 1982, Cheryl Blossom, "Riverdale's Newest Bombshell" was added to the mix.[48] Cheryl and her brother Jason were introduced in an *Archie* story titled "Dare to be Bare" that was published in *Betty and Veronica* # 320.[49] Over the next two years, Cheryl, Jason, their parents and Cheryl's classmates at Pembroke Academy were written into stories that were published in various issues of several of ACP's comic book series.[50] Cheryl and her friends were portrayed as private school snobs who looked down on the *Archie* characters who attended public high school. These characters then disappeared for ten years. They were resurrected in 1994 in a "cross-over" series entitled *The Love Showdown*. This story found Archie receiving a "mysterious love letter," a letter that prompted Betty and Veronica into a "frenzied battle over him."[51]

·DeCarlo admitted in his deposition that Goldwater approached him with the idea of creating Cheryl and her family. Goldwater explained to DeCarlo that he wanted to create a "real sex symbol," a rich and snobby character, and he asked DeCarlo to draw her and her family.[52] DeCarlo drew a model sheet depicting a family as Goldwater had requested, chose the name Cheryl Blossom, and created Jason, Cheryl's twin brother, a girlfriend of Cheryl's and her parents.[53] There is some evidence that DeCarlo did the drawings for one or two stories written by another for the *Cheryl Blossom* family.[54] With limited exceptions, ACP has made little use of this property.[55]

There is some debate as to who drew the first *Cheryl Blossom* stories. ACP's records indicate that DeCarlo's son, Daniel S. DeCarlo, Jr., was paid for illustrating the stories, although DeCarlo testified at his deposition that he thought the work looked like his own. DeCarlo, Jr., as well as all the other first hand witnesses to the matter, have passed away, making it unlikely that evidence will surface that can shed light on the matter. In the end,

---

**45.** Pl. 56.1 St. ¶ 113; Def. 56.1· St. at 4, ¶ A.

**46.** Pl. 56.1 St. ¶ 111; Def. 56.1 St. at 4, ¶ A. DeCarlo has since filed a number of copyright applications. ACP contends that they fail to satisfy the requirements of Section 408 of the Copyright Act because the materials submitted by DeCarlo are not originals, virtually identical to the originals, or a reconstruction of the originals. *See* Def. Let. 2 (May 1, 2002). In light of the holdings *infra*, it is unnecessary for the Court to resolve this issue.

**47.** Pl. 56.1 St. ¶ 174.

**48.** *Id.*

**49.** *Id. Betty and Veronica* is a long-running series that ACP had published since 1950.

The copyright notice on *Betty and Veronica* # 320 read "Copyright 1982 by Close–Up, Inc." Close–Up, Inc. was a subsidiary of ACP which subsequently has been merged into ACP. Pl. 56.1 St. ¶ 175.

**50.** *Id.* at ¶ 178, 180.

**51.** *Id.* at ¶ 180.

**52.** DeCarlo Dep. 2 at 342.

**53.** Pl. 56.1 St. ¶ 181; Def. 56.1 St. at 4, ¶ A.

**54.** *Id.* ¶¶ 181–82.

**55.** *Id.* ¶ 184.

though, this is immaterial to the ownership of the copyright in *Cheryl Blossom.*

### E. The Form of Voucher Agreement and Check Endorsements

During this litigation, DeCarlo produced a handwritten document which, he claimed, was a copy of an endorsement from the back of an ACP check made out to him in late 1970: [56]

> "This check is accepted as payment in full for all the undersigned's right, title and interest in and to the strip, copy, art, continuity, characters, story or manuscript entitled or used in (as listed below) and the undersigned affirms that the maker of this check and/or its assigns are given the full rights to use said property for publication, movies, talkies, radio, television, broadcasting, advertising, or for any other use. Permission is hereby granted to make editorial changes. Endorser is the autor [*sic*] or accredited agent in this sale and guarentees [*sic*] that the work is free from libel or infringement."

In addition, ACP produced (a) a form of voucher agreement used in its art department whereby the artist assigned all of the artist's right, title and interest in a relevant comic strip to ACP in consideration of compensation,[57] and (b) copies of the fronts and backs of four cancelled checks, one of which was dated December 17, 1985 and payable to DeCarlo.[58] The form of voucher agreement provides in relevant part:

> "KNOW ALL MEN, that I, _____ residing at _____ in consideration of the sum of $1.00 (One Dollar) paid by _____ ...,

herein called "the Assignee", hereby sell, assign, and transfer to the assignee all my right, title and interest in and to the name, title, trade mark and comic strip, including the character or characters portrayed therein, entitled _____ together with the world copyrights therein, and in all renewals and extensions of said copyright, which may be secured under the laws, now or hereafter, in force and effect in the United States, or in any other country or countries."

The endorsement on the recently produced checks, which was stamped on the reverse of the checks and then signed by the payee, provided in relevant part:

> "This check is accepted in full payment for all the undersigned's right, title and interest in and to the strip, copy, art, continuity, characters, story or manuscript entitled _____ and the undersigned agrees that the maker of this check and or its successors assigns are granted the full ownership rights to said work for publication, transcription by dramatization, movies, radio, television, broadcasting, advertising, or for any other uses including copyright. Permission is hereby granted to make editorial changes. Payer/Endorser is the author or accredited agent in this outright transactions and guarantees that the work is free from libel or copyright or other infringement."

Declarations submitted on DeCarlo's behalf state that freelance artists working for ACP were required to sign documents similar to or substantially the same as the

---

**56.** Herrmann Reply Decl. Ex. C.

**57.** Seymour Decl. Ex. A.

The particular example produced was dated February 6, 1981 and was an assignment by DeCarlo to ACP of his right, title and interest in and to a comic strip entitled *B & V,* which is not at issue here.

**58.** Seymour Decl. Ex. B.

Each of these productions should have been made earlier. There is no reason, however, to question the good faith of either side concerning their respective document productions. *See, e.g.,* Herrmann Reply Decl. ¶¶ 2–5.

form agreement and endorsements re-
ferred to above at least as early as 1954.[59]
In addition, DeCarlo testified at his depo-
sition that the handwritten copy he pro-
duced was "the contract on the back of the
old checks" and that it was used in 1970,
but he was unable to say precisely what
wording was used at various other points
in his lengthy relationship with ACP.[60] It is
undisputed, however, that the forms were
revised at least once during the period
April 1966 and 1982.[61]

### F. The Parties' Agreements

#### 1. The 1988 Agreement

On October 25, 1988, DeCarlo and ACP
entered into a so-called Newsstand Comic
Independent Contractor's Agreement (the
"1988 Agreement").[62] The contract began
with a series of recitals, including that

- ACP "is the publisher of comic strips
and comic books . . . of which [ACP] is
the sole and exclusive owner,"

- ACP "seeks to supplement its own
existing comic strips and comic books
(hereinafter the 'Existing Archie
Works') by the purchase of the entire
right, title and interest in existing
third party comic strips and pages for
its comic books (hereinafter the 'Ex-
isting Third Party Works'),"

- ACP "desires to retain third parties
to modify or otherwise work with the
Existing Archie Works and/or the Ex-
isting Third Party Works . . . on a
work made for hire basis, to create
modified comic strips and pages for its
comic books (hereinafter the 'Modified
Works')," and

- "[T]he Contractor [i.e., DeCarlo] de-
sires to confirm the assignment to
[ACP] of the Contractor's entire right,
title and interest in and to whatever
comic strips and pages for comic
books the Contractor may have here-
tofore provided [ACP] in furtherance
of this project and further desires to
work with [ACP] in the future under
the terms and conditions hereinafter
expressed." [63]

It then set forth covenants in relevant
part as follows:

"1. (a) The Contractor hereby assigns
and conveys to [ACP] all of its rights,
title and interest in the Existing Third
Party Works heretofore submitted to
[ACP].

"(b) The Contractor further agrees to
work with [ACP] on a work made for
hire basis to:

"(i) create and develop for [ACP's] ex-
clusive use Additional Works, and

"(ii) perform modifications of Existing
Archie Works, Existing Third Party
Works (including Existing Third Party
Works of others) and Additional Works
. . ." [64]

 * * * * * *

"2. (a) The Contractor hereby assigns
to [ACP] all right, title and interest in
and to all Works submitted under this
Agreement as well as to any patent
rights, copyrights, trademark rights
and/or applications therefore which re-
late thereto. The Contractor agrees to
execute all documents which are reason-
ably required to perfect such assign-
ment. It is agreed and understood that

---

59. Bolling Decl. ¶¶ 3–5; Edwards Decl. ¶¶ 4–
5.

60. DeCarlo Dep. 2, at 234–36, 332–34.

61. Gorelick Reply Decl. ¶ 4.

62. Pl. 56.1 St. ¶¶ 190–201 and exhibit there
cited. A copy of this agreement appears also

as Exhibit B to the complaint, which is at-
tached to the notice of removal, in *DeCarlo.*
00 Civ. 2344(LAK).

63. 1998 Agreement, preamble.

64. *Id.* ¶ 1.

such Works shall constitute Works Made for Hire and shall be the sole and exclusive property of [ACP]. To the extent any work of Contractor shall not be deemed under law to constitute subject matter which may be treated as work made on a Work Made for Hire basis, then Contractor hereby assigns and conveys to [ACP] all of its rights, title and interest in any such work.

"(b) The Contractor hereby expressly waives all claim of right which it may have to any ownership interest in such Works and/or the ARCHIE property."

### 2. The 1996 Agreement

The 1996 Agreement is entitled a Work for Hire Agreement between DeCarlo and ACP.[65] It began with a series of introductory recitals:

- ACP "is in the business of producing and/or publishing comic strips and comic books that include characters, artwork, stories, plots, trademarks, logos, and other creative expressions ('Properties'). All references to 'Properties' in this Agreement will include existing and future-created Properties that are commissioned by [ACP] and/or used in any of [ACP's] publications or licensed products."

- "All past, pending and future uses of all Properties, including uses by [ACP's] licensees, will be collectively referred to in this Agreement as the 'Works.'"

The 1996 Agreement then set forth provisions defining the relationship of the parties, their understanding regarding compensation, and so on. The key provisions included the following:

"5. Contractor's full and complete compensation for each assignment ... will be a fixed sum based on a rate to be mutually agreed upon .... Contractor will not be entitled to royalties, to income derived from licensing or merchandising, or to additional compensation for the creation of new Properties ...."

"19. To the extent that any past, pending or future contributions by Contractor to the Works or Properties do not qualify as a Work for Hire, Contractor will and hereby does assign to [ACP] any right, title and interest that he/she has or may obtain therein, including all copyrights, patents, trademarks and other proprietary rights. Contractor will sign, upon request, any documents needed to confirm that any specific Works or Properties are Works for Hire, to effectuate the assignment of his/her rights in any Works or Properties to [ACP] and/or to obtain copyright, trademark and/or patent protection for any of the Works or Properties."

### G. Plaintiff's Claims

ACP here seeks (1) declarations against DeCarlo's executrix that (a) the estate is barred on various theories from challenging ACP's exclusive rights, title and interest in and to the *Sabrina, Josie* and *Cheryl Blossom* properties, (b) DeCarlo's contributions to the *Sabrina* property were works for hire owned *ab initio* by ACP, and (c) Notices of Termination of Copyright and Related Licenses and Rights served by DeCarlo on ACP and its licensees, which purported to terminate transfers of copyright in the *Sabrina* and *Josie* properties, are ineffective, and (2) an injunction barring DeCarlo's successors in interest from (a) commencing or prosecuting any action challenging ACP's exclusive ownership of all rights, title and interest in and to the *Sabrina, Josie* and *Cheryl Blossom* properties, or (b) purporting to exer-

---

**65.** Pl. 56.1 St. ¶¶ 190, 202–11 and exhibit there cited. A copy of this agreement appears also as Exhibit C to the complaint, which is attached to the notice of removal, in *DeCarlo*. 00 Civ. 2344(LAK).

cise rights of termination pursuant to Section 203 of the Copyright Act.[66]

### H. Prior Proceedings in this Action

DeCarlo initially interposed counterclaims relating to his ownership of the *Sabrina* property on a number of theories. In passing on ACP's motion to dismiss the counterclaims, the Court held that DeCarlo failed to state a claim either for breach of fiduciary duty or under the Lanham Act.[67] Defendant, in turn, moved unsuccessfully to dismiss four of plaintiff's claims. In denying the motion, the Court held that plaintiff was entitled to the declaration it sought with respect to the validity of the termination notices.[68] It further held that defendant's position that he was "free to sue plaintiff and others based on claims for infringement arising within the three year period immediately preceding the filing of any complaint" "ma[de] little sense and [was] against the great weight of authority." [69]

### II. Discussion

In resisting a motion for summary judgment, it is not enough for the nonmoving party to allege the existence of a genuine issue of material fact. When, as here, the moving party has proffered affidavits and other admissible evidence to demonstrate the absence of any factual issues, the nonmoving party must come forward with probative evidence that points to the existence of a factual dispute that precludes summary judgment.[70] Moreover, not any factual dispute will defeat a motion for summary judgment.[71] The dispute must be genuine, that is to say the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." [72] And it must relate to a material fact, that is a fact that will affect the substantive outcome of the case.[73]

### A. Ownership of the Properties

#### 1. Josie

■ The Court already has decided that, as between ACP and DeCarlo, DeCarlo is equitably estopped to assert any claim to ownership of copyright in the *Josie* property.[74] As defendant now asserts, a *sine qua non* of that conclusion was a determination "that ACP was 'ignorant of the facts alleged by DeCarlo, *i.e.*, that he claim[ed] ownership in the characters' and object[ed] to ACP's exploitation fo [*sic* ] them." [75]

---

**66.** 17 U.S.C. § 203.

**67.** *Archie Comic Publ'ns, Inc., v. DeCarlo,* 141 F.Supp.2d 428, 432–35 (S.D.N.Y.2001) *("Archie I ")*.

**68.** *Archie Comic Publ'ns, Inc. v. DeCarlo,* No. 00 Civ. 5686(LAK), 2001 WL 1543526, at *3 (S.D.N.Y. Dec.3, 2001) *("Archie II ")* ("[A]ny right that defendant may have to terminate rights transferred pursuant to the 1988 and 1996 Agreements must be exercised during the five year period beginning at the end of thirty-five years from the date on which the relevant grants were executed.").

**69.** *Id.* at *4.

**70.** *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**71.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.").

**72.** *Id.* at 248, 106 S.Ct. 2505.

**73.** *Id.*

**74.** *DeCarlo I,* 127 F.Supp.2d at 508–11.

**75.** Def. Mem. 16 (quoting *DeCarlo I,* 127 F.Supp.2d at 511).

DeCarlo now argues that the recently produced documents—the form of agreement and the check endorsements referred to above—"plainly refutes this finding and bars any finding of equitable estoppel in this (or the prior) case." [76] Even assuming, for the sake of argument, that the evidence, if offered in *DeCarlo I*, would have raised a genuine issue of material fact sufficient to defeat ACP's motion for summary judgment on equitable estoppel grounds, which is doubtful for reasons suggested below, defendant nevertheless overlooks the fact that the judgment in *DeCarlo I* has preclusive effects here.

To begin with, DeCarlo's claim in *DeCarlo I* was that he owned the *Josie* property. "Under established principles, a final judgment on the merits 'prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.' " [77] In consequence, the judgment in *DeCarlo I* bars any subsequent claim by which defendant might seek ownership of the *Josie* property, regardless of whether the particular grounds were asserted in the prior action. The estate's contention that ACP is not entitled to "a declaration that DeCarlo may not challenge ACP's exclusive ownership of the *Josie* property" is just such a claim. Its position in this case therefore is foreclosed by the judgment in *DeCarlo I*.

 The same result would be reached by issue preclusion.

"Litigants who have had a full and fair opportunity to litigate ordinarily will not be heard to relitigate an issue actually, finally and necessarily decided against them in a prior action. In order for this doctrine of issue preclusion to apply, four requirements must be satisfied:

"(1) the issues in both proceedings must be identical (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a final judgment on the merits.' " [78]

Each of these criteria is satisfied here.

As noted, *DeCarlo I* was decided on the ground that DeCarlo was equitably estopped to challenge ACP's ownership. ACP makes precisely that claim here. The question whether ACP was ignorant of DeCarlo's claim of ownership in the *Josie* property was essential to the decision in *DeCarlo I*, actually litigated and necessarily decided. DeCarlo had a full and fair opportunity to litigate it. The estate therefore is collaterally estopped by the finding in *DeCarlo I* from contesting ACP's ignorance of DeCarlo's claim of ownership in the *Josie* property.

The recent production of the form of agreement and the check endorsements does not alter this conclusion. *Res judicata* and collateral estoppel apply even in the face of a claim that the prior judgment was erroneous as long as that judgment stands.[79] In any case, DeCarlo had his

**76.** Def. Mem. 16.

**77.** *ICD Holdings S.A. v. Frankel*, 976 F.Supp. 234, 242 (S.D.N.Y.1997) (quoting *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979)).

**78.** *Id.* at 239 (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir.1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987)).

**79.** *E.g., Friarton Estates Corp. v. City of New York*, 681 F.2d 150, 158 (2d Cir.1982) (Friendly, J.) ("Res judicata protects wrong decisions as fully as right ones."); *Ellentuck v. Klein*, 570 F.2d 414, 425 (2d Cir.1978); *Mitchell v. Nat'l Broad. Co.*, 553 F.2d 265, 272 (2d Cir.1977) (applicability of doctrine "does not depend on whether the prior judgment was free from error"); 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER,

copy of the check endorsement used in 1970 and access to Messrs. Bolling and Edwards and the documents they possessed at the time *DeCarlo I* was litigated. He has offered no explanation for his failure in that case to raise the contention he now makes. In all the circumstances, defendant is precluded by *DeCarlo I* from asserting any claim of ownership in the *Josie* property.

### 2. Sabrina

ACP asserts ownership of the *Sabrina* property on a number of grounds. The Court begins with the contention that DeCarlo's contributions to each were works for hire in consequence of which ACP owns the copyrights.

#### (a) Sabrina *Works Prior to January 1, 1978*

Works created before January 1, 1978, the effective date of the Copyright Act of 1976 (the "1976 Act"), are governed by the Copyright Act of 1909 (the "1909 Act"). Under that statute, a work by an independent contractor such as DeCarlo, in the absence of an agreement to the contrary, was a work for hire if it was created at the "instance and expense" of the hiring party.[80] The instance and expense test is satisfied if the putative employer was the motivating factor that induced the creation of the work.[81] An essential element of this relationship was the right of the hiring party to control and supervise the manner in which the work was created.[82] The expense requirement was met if "a hiring party simply [paid] an independent contractor a sum certain for his or her work."[83]

The first *Sabrina* story, as well as the model sheet, assuming there was one, was prepared in or perhaps before 1962. ACP quite clearly induced the creation of the *Sabrina* works.[84] It retained editorial and stylistic control over anything submitted by DeCarlo. DeCarlo was paid for his contributions to the *Sabrina* properties.[85] Those contributions therefore presumptively were works for hire, and ACP is entitled to judgment unless DeCarlo has adduced admissible evidence which, construed in his favor, could justify a finding that the parties agreed that DeCarlo would own the copyright notwithstanding DeCarlo's admission that he understood "[ACP] thought that they were owners, that they owned the copyright,"[86] an admission very much in tension with any

---

FEDERAL PRACTICE AND PROCEDURE· JURISDICTION AND RELATED MATTERS 2D § 4403, at 30–33 (2002) ("res judicata is not defeated by error in the initial judgment"; "ordinarily applies despite the availability of new evidence …"). While the RESTATEMENT OF JUDGMENTS 2D suggests that an exception might be made where the prior judgment is the product of the defendant's fraud, *see* RESTATEMENT OF JUDGMENTS 2D § 26, com. *j* (1982), such exceptions seldom have been made in practice, 18 WRIGHT § 4415, at 359–62. In any case, as noted above, there has been no showing in this case of fraud in *DeCarlo I*.

80. *Playboy Enters., Inc. v. Dumas*, 53 F.3d at 549, 554 (2d Cir.1995).

81. *Siegel v. Nat'l Periodical Publ'ns, Inc.*, 508 F.2d 909, 914 (2d Cir.1974).

82. *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1216 (2d Cir.1972).

83. *Playboy*, 53 F.3d at 555.

84. *See, e.g.*, DeCarlo Dep. 2 at 14 (explaining that DeCarlo first became involved with the *Sabrina* project when Goldwater approached him with Gladir's script); *id*. at 19 ("[Richard Goldwater] had to look at what I drew and pass judgment on it.").

85. *See, e.g., id.* at 30–31. The fact that he was paid for each assignment satisfies the expense prong of the work for hire test. *Playboy*, 53 F.3d at 555.

86. DeCarlo Dep. 2 at 128.

contention that ACP agreed that DeCarlo owned the copyright. This he has failed to do.

◼ *First,* the lynchpin of DeCarlo's contention that there indeed was an agreement or agreements to the contrary is the form of voucher agreement and the check endorsements to which reference already has been made. But he has produced no such agreement with respect to any *Sabrina* contributions. Rather, he has adduced evidence that there were, or perhaps were, voucher agreements and check endorsements relating to his *Sabrina* contributions—all of which have been lost—and that their terms were "similar" or "identical" to the forms that he has proffered, at least so far as a couple of witnesses remember decades later.

The best evidence rule ordinarily requires that the terms of a written instrument be proved by the instrument itself.[87]

Where, as here, the original instrument has been lost, its contents may be proved by other evidence.[88] And that is what DeCarlo has sought to do. The question is whether the evidence is sufficient to raise a genuine issue of material fact.

The standard governing this question is reasonably clear. As Judge Pollack has written, "[r]elief for an alleged breach of a written contract cannot be granted where the alleged contract has not been produced, plaintiff's testimony regarding the alleged contract is inconclusive, [and] essential terms of the alleged contract are in doubt ...."[89] Indeed, the cases cited in the margin, the strength of the presumption of a work for hire relationship absent proof of a contrary agreement, and the Nimmers support the view that plaintiff is obliged to produce evidence sufficient to justify a finding of a contrary agreement by clear and convincing evidence.[90]

---

87. FED. R. EVID. 1002.

88. *Id.* 1004(1).

89. *Sims v. Blanchris, Inc.,* 648 F.Supp. 480, 485 (S.D.N.Y.1986).

90. *Crawford v. 733 San Mateo Co.,* 854 F.2d 1220, 1221 (10th Cir.1988) (proof of terms must be "clear, cogent and convincing") (New Mexico law); *Rash v. Peoples Dep. Bank & Trust Co.,* 192 F.2d 470, 471 (6th Cir.1951) (terms of lost agreement may not be proved "where assumed recollection of specific facts after the lapse of years taxes the credulity of the court") (Kentucky law); *Chicago, Wilmington & Franklin Coal Co. v. Menhall,* 131 F.2d 117, 120 (7th Cir.1942) (description contained in lost deed must be prove by clear and convincing evidence) (Illinois law); *Gill v. Colton,* 12 F.2d 531, 534 (4th Cir.1926) (content of lost instrument must be proved "by evidence of the clearest and most satisfactory character") (West Virginia law); *Metlife Capital Corp. v. Westchester Fire Ins. Co.,* 224 F.Supp.2d 374, 384 (D.P.R.2002) ("surmise, conjecture, or speculation" as to contents insufficient to prove content of lost insurance policy) (Puerto Rico law); *La Capria v. Bonazza,* 153 A.D.2d 551, 552–53, 544 N.Y.S.2d

848, 849 (2d Dept.1989) (content of lost deed must be proved by "clear and certain evidence"); *Barranco v. Kostens,* 189 Md. 94, 98, 54 A.2d 326, 328 (1947) (proof of contents of lost instrument "must be clear and positive and of such a character as to leave no reasonable doubt as to its terms and conditions"); 4 CAROLINE N. BROWN, CORBIN ON CONTRACTS § 12.10, at 828 (rev. ed.1997); 75A N.Y. JUR.2D, *Lost and Destroyed Instruments and Records* § 38 (2000).

The Nimmers argue that clear and convincing evidence perhaps should be necessary to establish the existence and terms of a lost assignment in order to ameliorate the risk that the Copyright Acts' requirement of written assignments would be undermined if "unsubstantiated claims that [parties] had obtained (but subsequently 'lost') the requisite instrument were widely credited." 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 10.03[A][5], at 10–46 to 10–47 (2002). Precisely the same rationale supports a requirement of clear and convincing evidence to overcome the presumption of a work for hire relationship upon proof that the work was made at the instance and expense of the putative employer.

There is considerable uncertainty as to the language of the forms of voucher agreement and check endorsements that were used in the 1960's when *Sabrina* was created and at any other time prior to the effective date of the 1976 Act. The evidence concerning the voucher agreement was that *a* form of voucher agreement has been used in the art department to pay for work produced for ACP, but there is no proof as to when that practice started.[91] One ACP witness testified that the form used in 2000 is "similar" to the 1981 version produced during discovery.[92] Two freelance artists aver that they were required by ACP for many years to sign voucher forms containing language similar or identical to that on the 1981 version, although neither was able to quote or produce the language.[93]

The situation with respect to the check endorsements is similar. We have DeCarlo's handwritten copy of an endorsement he says he signed in 1970, but he was not able to say precisely what wording was used at various other points during his relationship with ACP.[94] The only surviving check endorsed by DeCarlo (it bears the form of endorsement quoted above) is dated January 3, 1986,[95] long after the effective date of the 1976 Act. The declara-tions of the two other artists that defendant has submitted are equally unillumi-nating. Mr. Bolling has produced a form of endorsement used in 1980 that is identi-cal to that on DeCarlo's 1986 check,[96] which suggests that this particular form was in use at least during the period 1980 through early 1986. And Mr. Edwards avers that he signed hundreds of check endorsements over nearly four decades which were "similar" to that form, whatev-er that means.[97]

In the last analysis, it is DeCarlo's bur-den to produce evidence which, if credited, would permit a trier of fact reasonably to conclude, by clear and convincing evidence, that DeCarlo and ACP agreed that DeCar-lo would own the copyright to his pre–1978 contributions to the *Sabrina* property not-withstanding the "almost irrebutable"[98] presumption that these were works for hire. While there is evidence as to a form of endorsement used in the period from 1980 until 1986 and as to a form of voucher agreement used in 1981, the Copyright Act provisions dealing with works for hire changed with the enactment of the 1976 Act. The evidence demonstrates also that the form of endorsement used in at least part of the 1980's differed from that which DeCarlo copied down in 1970, thus con-firming that the language changed at least once in the 1970–1980 period.[99] Beyond

---

91. Goldwater Dep. 2, at 60–62.

92. *See id.*

93. Bolling Decl. ¶ 5; Edwards Decl. ¶ 4.

94. DeCarlo Dep. 2, at 234–36, 332–34.

95. The endorsement refers to "B & V," "jug w/archie," "double dig.," and "laugh dig. # 64—rpeirnt [*sic* ]." The first two references apparently are to *Betty and Veronica* and *Jug-head With Archie*, works not here at issue. The reference to "double dig." is obscure, but bears no similarity to anything related to *Sa-brina*. The reference to "laugh dig." also is obscure. Nevertheless, ACP did publish a comic book entitled *Laugh–Out Starring Sa-brina the Teen–Age Witch*, a comic book pub-lished from late 1969 until late 1985. Pl. 56.1 St. ¶¶ 23(c)-(d). Although it is undisputed that DeCarlo did very little for the *Laugh–Out Series, id.* ¶ 23(d), he is entitled to, for pur-poses of this motion, an inference that the check included payment for some contribu-tion by him to issue number 64 in the *Laugh–Out* series.

96. Bolling Decl. ¶ 3 & Ex.

97. Edwards Decl. ¶ 5.

98. *Easter Seal Soc'y for Crippled Children and Adults of Louisiana v. Playboy Enters.*, 815 F.2d 323, 327 (5th Cir.1987).

99. *See also* Goldwater Reply Decl. ¶ 3.

that, we have nothing as to the wording that was used either in the endorsements or in the voucher agreement at any time prior to the effective date of the 1976 Act beyond conclusory assertions, decades after the fact, that it was similar or identical to that used later on.

In these circumstances, any determination by a trier of fact as to what the text was during the relevant period, even with the benefit of the vague testimony of Messrs. Edwards and Bolling, would be speculation. Hence, even assuming that knowledge of the language would answer the work for hire question, DeCarlo has failed to sustain his burden of adducing admissible evidence which, if credited, would permit a rational finding, by clear and convincing evidence, as to the substance of that language. Indeed, the Court would reach precisely the same result under a preponderance of the evidence standard, as this Circuit does "not permit an issue to go to trial on the basis of mere speculation in favor of the party that bears the burden of proof." [100] "[A]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact (that is known to exist)." [101] The evidence before the Court does not permit a reasoned, logical decision as to the terms of any voucher agreements and check endorsements during the relevant period.

■ *Second*, even if one were to assume that the check legends and voucher agreement forms used from 1960 through the end of 1977 were the same as the endorsement DeCarlo copied down in 1970, the assumption would not permit an inference (under either a clear and convincing or a preponderance standard) that ACP and DeCarlo agreed that DeCarlo would retain copyright in his contributions to the *Sabrina* property. The 1970 endorsement confirms that ACP's "check is accepted as full payment for all the undersigned's right, title and interest in and to the strip, copy, art, continuity, characters, story or manuscript entitled or used in" the story identified on the check. It "affirms that the maker of this check and/or its assigns are given the full rights to use said property for publication, movies, talkies, radio, television, broadcasting, advertising, or for any other use" and have the right to make editorial changes. And it represents that the "endorser is autor [*sic*] or accredited agent in this sale and guarentees [*sic*] that the work is free from libel or infringement." Thus, the endorsement, far from suggesting that DeCarlo retained copyright in the contribution for which the endorsed check was issued, supports the view that ACP was the sole owner of all rights.

The Second Circuit's decision in *Playboy Enterprises* [102] confirms this conclusion. *Playboy* paid for certain of the works there at issued with checks that were stamped with what the Circuit referred to as Legend A, which provided in relevant part that the payee, "[b]y endorsement of this check, ... acknowledges payment in full for the assignment to Playboy Enterprises, Inc. of all right, title and interest in and to" enumerated works.[103] The trial court found that this endorsement evidenced an agreement that the artist would retain copyright, reasoning that the endorsement would have stated that the relationship was an employment for hire if that in fact had been the intention.[104] The Court of Appeals, however, concluded that

100. *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 144 (2d Cir.1999).

101. *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir.1999).

102. 53 F.3d 549.

103. *Id.* at 552.

104. *Id.* at 556.

this finding was clearly erroneous and ruled that the relationship was an employment for hire:

. "[W]e find it impossible to discern the intent of the parties from the language of Legend A. The legend acknowledges an assignment of rights, but it does not specifically mention copyright—let alone common law copyright. It could intend the transfer of a one-time use right, ... or of common law copyright, as Playboy argues, or of all rights—including both copyright and possessory rights. As Legend A is not clear, and as Playboy's explanation for the agreement is at least plausible, we are not convinced that the legend either proves or disproves that the parties intended something other than a work-for-hire relationship.

"Given the controverted evidence of a contrary agreement between Playboy and Nagel, we conclude that it was clearly erroneous for the district court to find that Dumas met her burden of proving that the parties intended a relationship other than work for hire. *Hence, by presumption, Playboy is the 'author' of the works created before January 1, 1978 that were made for hire.*" [105]

This analysis governs here. The language of the 1970 endorsement copied down by DeCarlo does not even expressly acknowledge an assignment. The acceptance of the payment "for all of the under-signed's right, title and interest" in the enumerated works might have reflected a transfer of a limited right, whether one-time use or something else. But it is equally plausible that it was in the nature of a quitclaim—a transfer of DeCarlo's interest, *if any*, in the works—or perhaps of common law copyright or possessory rights. It simply is not clear. And the result in such a situation, *Playboy* teaches, is that the presumption of a work for hire relationship prevails.

*Third,* the 1988 Agreement assigned to ACP all of DeCarlo's "rights, title and interest in the Existing Third Party Works heretofore submitted to Archie" [106] and conveyed to ACP any rights that DeCarlo had in any of the comic strips and pages that he previously had "submitted to Archie," which included all of his *Sabrina* artwork.[107]

*(b)* Sabrina *Works After January 1, 1978*

■ As an initial matter, DeCarlo's assignment in the 1988 and 1996 Agreements to ACP of any rights he may have had to any *Sabrina* works is dispositive of ACP's claim of ownership with respect to these works. As discussed above, the 1988 Agreement assigned to ACP all of DeCarlo's "rights, title and interest in the Existing Third Party Works heretofore submitted to Archie" and conveyed to ACP any rights that DeCarlo had in any of the

105. *Id.* at 557 (emphasis added).

106. "Existing Third Party Works" was defined as "existing third party comic strips and pages for its [ACP's] comic books." Accordingly, any rights that DeCarlo may have retained in any of his contributions to the *Sabrina* comic books and materials were rights in Existing Third Party Works that were assigned by the 1988 Agreement.

107. The same result would obtain under the 1996 Agreement, by which DeCarlo assigned to ACP any of his "past, pending or future contributions ... to the Works or Properties" that do not qualify as works for hire, "including all copyrights." "Properties" is defined to include all characters that appear in any of ACP's comic books, comic strips or licensed products. A character becomes a "Property" if it is "commissioned by Archie and/or used in any of Archie's publications or licensed products." Thus, once a character is used by ACP and thereby becomes a "Property," all "past, pending and future uses" of that character become "Works" subject to the Agreement.

comic strips and pages that he previously had "submitted to Archie," which included all of his *Sabrina* artwork. Under the 1996 Agreement, DeCarlo assigned to ACP any of his "past, pending or future contributions ... to the Works or Properties," which included all characters that appear in any of ACP's comic books, comic strips or licensed products.[108] But this is not the only basis on which the Court finds that ACP owns the post–1978 *Sabrina* property.

Between January 1, 1978, the effective date of the 1976 Act, and October 25, 1988, the date of the 1988 Agreement, DeCarlo illustrated only three short stories, three short gags, some covers and a fashion page involving *Sabrina*.[109] ACP contends that none of these projects contained any new *Sabrina* material. Its Rule 56.1 Statement, which stands admitted, states:

"[t]he original look, personalities and interrelationships of the *Sabrina* characters, as well as the original on-going plot elements of the property, were developed in the first *Sabrina* stories, the Filmation programs and the stories published in the early issues of Laugh–Out.... None of [the works illustrated by DeCarlo between January 1, 1978 and October 25, 1988] contain any new delineation of the *Sabrina* property or characters." [110]

■ Copyright in a character is vested when the character is "completely developed." [111] In view of the fact that DeCarlo's minimal contributions to the *Sabrina* property in the 1978–1988 period contained no new delineation of the property or characters, ACP owns those works.

■ In any case, *Sabrina* works created after October 25, 1988, the date of the 1988 Agreement, qualify as works for hire owned by ACP. Works created on or after January 1, 1978 are governed by the 1976 Act. To constitute a work for hire, a work must fit into one of nine categories,[112] be

---

**108.** The Court notes that DeCarlo argued in *DeCarlo I* that the 1996 Agreement did not assign his alleged copyrights in the *Josie* property on the theory that the "Properties" referred to in paragraph 19 of the 1996 Agreement were solely comic books and comic strips and, in consequence, that his "contributions" were only the end-product drawings that ACP commissioned him to produce for publication. From this premise, he contended that the original sketches and characters were not "contributions" to the "Properties" and therefore were not assigned to ACP. *DeCarlo I*, 127 F.Supp.2d at 508 n. 61. The Court found it unnecessary to rule on the point in that case.

DeCarlo has renewed that argument in this case with respect to model sheets he allegedly created in 1997, which depicted updated looks for *Sabrina*'s Aunt Hilda and Aunt Zelda. Def. Mem. 21–22. He argues that he did not assign rights to these model sheets to ACP and raises the novel argument that model sheets are not within the nine categories of works eligible under the 1976 Act for work for hire status. *Id.* at 22. The Court finds that DeCarlo's proposed construction of the 1996 Agreement is unreasonable in light of the fact that the agreement defined "Properties" to include "licensed products," which DeCarlo has conceded include dolls, recordings, animated cartoons, and live-action motion pictures. *DeCarlo I* Cpt. ¶ 24(b). DeCarlo's argument that model sheets are not within the nine categories of works eligible for work for hire status is of no moment because, under the 1996 Agreement, DeCarlo assigned to ACP "any right, title and interest" in contributions that do not qualify as works for hire. The Court therefore holds that the 1996 Agreement unambiguously assigned to ACP all right, title and interest, if any, that DeCarlo had in the *Sabrina* property.

**109.** Pl. 56.1 St. at 123. A "gag" is a short, one page or less, piece that contains a single joke. A fashion page depicts a character in one or more outfits but contains no text. *Id.*

**110.** *Id.* at ¶ 123.

**111.** *Siegel*, 508 F.2d at 914.

**112.** Comic strips arguably qualify as works for hire under the "contribution to a collec-

specially ordered or commissioned, and the parties must agree expressly that the work constitutes a work for hire.[113] The "specially ordered or commissioned" prong incorporates much of the "instance and expense" test from the 1909 Act: a work is specially ordered or commissioned within the meaning of the 1976 Act if the hiring party was the "motivating factor" behind the work and the independent contractor was paid for the work.[114] Although the hiring party often retains artistic control over the work, such control is not an absolute requirement of the work for hire test.[115]

The *Sabrina* works fall within the periodical categories covered by the 1976 Act. All were specially ordered or commissioned by ACP.[116] Moreover, the 1988 Agreement expressly provided that all works DeCarlo submitted to ACP would constitute works for hire,[117] and the 1996 Agreement further stated that "[t]his is a Work for Hire agreement between Archie Comic Publications, Inc. . . . and Daniel S. DeCarlo." [118] In consequence, any contributions by DeCarlo to the *Sabrina* property created after October 25, 1988, the date

of the 1988 Agreement were works for hire.

### 3. Cheryl Blossom *Properties*

The *Cheryl Blossom* works are part of the *Archie* property.[119] Paragraph 2(b) of the 1988 Agreement provides that DeCarlo "hereby expressly waives all claims of right which [he] may have to any ownership interest in such works and/or the ARCHIE property." In consequence, ACP also is the owner of any copyright interests in the *Cheryl Blossom* property. Moreover, for reasons discussed above, DeCarlo assigned any rights he may have had to any such works in the 1988 and 1996 Agreements.

### B. *The Termination Notices*

■ The Court held in *Archie II* that "any right [DeCarlo] may have to terminate rights transferred pursuant to the 1988 and 1996 Agreements must be exercised during the five year period beginning at the end of thirty-five years from the date on with the relevant grants were executed." [120] In consequence, the purported notices of termination, to the extent DeCarlo has a right to serve them, are premature. ACP is entitled to a declaration that they are null and void.[121]

---

tive work" eligible category. 17 U.S.C.A. § 101. A collective work is defined as "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." *Id. Cf. Playboy*, 53 F.3d at 558 ("Playboy magazine is a 'collective work'").

**113.** *Playboy*, 53 F.3d at 557–58.

**114.** *Id.* at 562–63.

**115.** *Id.* at 562.

**116.** DeCarlo testified that he never submitted any unsolicited, that is to say unassigned, artwork to ACP. He further testified that he was paid for all the *Sabrina*-related artwork that he did. DeCarlo Dep. 2 at 250.

**117.** *E.g.,* 1988 Agreement at ¶ 2(a) ("all Works submitted under this Agreement . . .

shall constitute Works Made for Hire and shall be the sole and exclusive property of Archie").

**118.** 1996 Agreement at preamble; *id.* at ¶ 18 (all of DeCarlo's "contributions to any Properties of Works have been commissioned by Archie and prepared at the request and expense of Archie and that all past, pending and future contributions of [DeCarlo] to the Works and Properties are and shall be Works for Hire owned by and for the benefit of Archie.").

**119.** Pl. 56.1 St. ¶¶ 174–83.

**120.** *Archie II*, 2001 WL 1543526 at * 3.

**121.** The termination rights provided for in Section 203 of the 1976 Act, 17 U.S.C. § 203, do not apply in cases of works for hire. Because the *Sabrina* property was created as a

*C. Injunctive Relief Sought by ACP*

Plaintiff's third claim for relief seeks an injunction barring defendant from suing or threatening to sue ACP and its licensees with respect to the *Josie, Sabrina* and *Cheryl Blossom* properties. In view of the Court's determination that ACP, and not defendant, owns the copyrights in those properties, and in view also of the clear threat of further harassment by this litigious defendant, ACP is entitled to that relief.

### III. Conclusion

ACP's motion for summary judgment is granted to the extent that ACP shall recover judgment:

(1) declaring that defendant is equitably estopped from challenging ACP's exclusive ownership of all rights, title and interest, including copyrights, in and to the *Josie* property;

(2) declaring that defendant's testator's contributions to the *Sabrina* property were works for hire owned *ab initio* by ACP and, in any case, that any right, title and interest therein, including copyrights, which he ever had were assigned by him to ACP;

(3) declaring that all right, title and interest of defendant's testator's contributions to the *Cheryl Blossom* property, if any, were assigned by him to ACP;

(4) declaring that the Notices of Termination of Transfer of Copyright and Related Licenses and Rights referred to in the complaint are null and void; and

(5) enjoining defendant from:

(a) commencing any action against ACP, its successors, its licensees and its licensees' successors which challenges ACP's ownership of the *Josie, Sabrina* and/or *Cheryl Blossom* properties, and/or any character or characters depicted therein, which challenges ACP's ownership thereof, including without limitation, copyrights therein, premised on the assertion that defendant's testator has and/or ever has had any rights therein; and

(b) serving and/or recording any notice of termination of transfer of copyright pursuant to 17 U.S.C. § 203 with respect to the *Sabrina* property, and/or any character or characters depicted therein, premised on the assertion that defendant's testator has and/or ever has had any rights therein.

Settle judgment on five business days notice.

SO ORDERED.

---

work for hire, the Section 203 termination right does not apply to this property, other than possibly to the three short stories, three short gags, covers and fashion page that De-Carlo illustrated between January 1, 1978 and October 25, 1988, none of which resulted in any new delineation of the *Sabrina* charac-

ters. Whether defendant or DeCarlo's heirs may be entitled to invoke Section 203 with respect to any of DeCarlo's *Josie* or *Cheryl Blossom* works is a question which, in the case of the 1988 assignment, can occur no earlier than 2013. The Court declines to rule on this issue at this time.