CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued: February 6, 2013                    Decided: November 8, 2013)

Docket Nos. 11-4904-cv, 11-4905-cv, 11-5104-cv, 11-5106-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CILP ASSOCIATES, L.P., COHEN POOLED ASSETS L.P., ANDREW E. LEWIN,
individually and as Trustee of the Regina Gruss Trust f/b/o Andrew Lewin,
CLEMENT LEWIN, as Trustee of the Regina Gruss Trust f/b/o Andrew Lewin
and in individual capacity and derivatively on behalf of Lipper Convertibles,
L.P., MARINA LEWIN, in individual capacity and derivatively on behalf of
Lipper Convertibles, L.P.,

Plaintiffs-Appellants,

v.

PRICEWATERHOUSE COOPERS LLP,

Defendant-Cross-Defendant-Cross-Claimant-Appellee,

LIPPER CONVERTIBLES, L.P., LIPPER HOLDINGS, LLC, LIPPER &
COMPANY, L.P., KENNETH LIPPER, ABRAHAM BIDERMAN,

Defendants-Cross-Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: KEARSE and LOHIER, Circuit Judges, and KAPLAN, District Judge.[*]

This appeal arises from the collapse of the hedge fund Lipper Convertibles, L.P. The plaintiffs appeal from the District Court's grant of summary judgment on their claims against Lipper Convertibles' auditor PricewaterhouseCoopers LLP ("PwC"), under Section 10(b) of the Securities Exchange Act of 1934 and for fraud and negligent misrepresentation under New York law. For the Section 10(b) claims only, we conclude that there is a triable issue of fact as to whether the plaintiffs suffered a direct injury at the time of their investment by purchasing their interests in Lipper Convertibles at fraudulently inflated prices. Accordingly, we AFFIRM the District Court's judgment dismissing the plaintffs' state law claims, VACATE its dismissal of the plaintiffs' Section 10(b) claims, and REMAND to the District Court to consider in the first instance PwC's scienter argument and for further proceedings.

DANIEL W. KRASNER (Eric B. Levine, Gregory M. Nespole, Stephen H. Orel, on the brief), Wolf Haldenstein Adler Freeman & Herz LLP, New York, NY, for Plaintiffs-Appellants.

J. PETER COLL, JR. (Steven J. Fink, on the brief), Orrick, Herrington & Sutcliffe LLP, New York, NY, for Defendant-Cross-Defendant-Cross-Claimant-Appellee.

LOHIER, Circuit Judge:

This appeal arises from the collapse of the hedge fund Lipper Convertibles,

L.P. The plaintiffs appeal from the District Court's grant of summary judgment

---

[*] The Honorable Lewis A. Kaplan, of the United States District Court for the Southern District of New York, sitting by designation.

on their federal claims against Lipper Convertibles' auditor, PricewaterhouseCoopers LLP ("PwC"), under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as their state law claims of fraud and negligent misrepresentation. With respect to the Section 10(b) claims, we conclude that there is a genuine dispute as to whether the plaintiffs suffered a direct injury at the time of investment by purchasing their shares in Lipper Convertibles funds at fraudulently inflated prices. Accordingly, we VACATE the grant of summary judgment on the Section 10(b) claims and REMAND to the District Court to consider in the first instance PwC's scienter argument and for further proceedings. As for the state law claims, we AFFIRM.

## BACKGROUND

A. Facts

On appeal of a grant of summary judgment in favor of PwC, "we construe the evidence in the light most favorable to the Plaintiffs, drawing all reasonable inferences and resolving all ambiguities in their favor." Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 151 (2d Cir. 2012) (brackets and quotation marks omitted).

3

At all relevant times Lipper Convertibles (to which we sometimes refer as the "Fund") was a hedge fund organized as two New York limited partnerships managed by a general partner, Lipper Holdings, LLC, pursuant to a partnership agreement.[1] Under the agreement, the Fund's limited partners did not acquire direct ownership of the securities in which Lipper Convertibles invested. Instead, each limited partner contributed capital entitling it to a share of the Fund's profits and losses. After a limited partner invested, its capital account with the Fund would be debited and credited with proportionate shares of the partnership's profits, losses, and expenses. Each limited partner's initial percentage ownership interest in the Fund was calculated by taking the value of that limited partner's cash contribution and dividing it by the total stated value of all existing partners' capital accounts.

A significant portion of the securities in which Lipper Convertibles invested on behalf of the partnership consisted of convertible preferred stocks and convertible bonds[2] that traded over-the-counter and for which there were no

---

[1] Throughout this opinion we refer to both limited partnerships – Lipper Convertibles, L.P. and Lipper Convertibles Series II, L.P. – collectively as "Lipper Convertibles" or the "Fund."

[2] The parties described "[c]onvertible securities" as "bonds and preferred equity securities that can be converted into a predetermined number of shares of common stock at the investor's option."

4

publicly available valuations. According to the plaintiffs' expert report submitted at summary judgment, Lipper Convertibles was to determine the fair value of the Fund's securities based on available "market quotations . . . in the form of bid and asked price quotes from broker-dealers or from Bloomberg." Edward Strafaci, the Fund's principal trader,[3] was responsible for valuing the Fund's securities at all relevant times.

For fiscal years 1996 through 2000, Lipper Convertibles retained PwC as its outside auditor to review the year-end financial statements that detailed the Fund's performance and the value of each limited partner's interest, and to confirm that the statements were accurate and conformed with Generally Accepted Accounting Principles ("GAAP"). See Continental Cas. Co. v. PricewaterhouseCoopers, LLP, 15 N.Y.3d 264, 267 (2010). Each year, PwC issued an audit letter opining that the financial statements "present fairly, in all material respects, the financial position of Lipper Convertibles, L.P." in conformity with GAAP and that its audit complied with Generally Accepted Auditing Standards.

Two different groups of plaintiffs purchased interests in Lipper Convertibles as limited partners. Collectively, these plaintiffs invested a total of

---

[3] Strafaci's title was "convertible portfolio manager and director of research."

5

$8,765,806 in the Fund through five separate investments on various days between May 1998 and April 2001.

In January 2002 Strafaci abruptly left Lipper Convertibles. In February 2002 Lipper Convertibles issued a letter to its limited partners announcing that it would be revaluing the securities in which it had invested in the wake of Strafaci's "unexpected[]" departure and after an internal review indicated that "a more cautious valuation was warranted." The letter warned that Lipper Convertibles anticipated reducing its portfolio valuation by approximately 40 percent. The following month, March 2002, Lipper Convertibles announced that the portfolio valuation had in fact declined by approximately 45 percent during the calendar year 2001, and that Lipper Convertibles would be immediately dissolved and the remaining assets distributed to the limited partners according to an established distribution plan.

1. The BDO Reports

Following the announcement, Lipper Convertibles retained an accounting firm, BDO Seidman, LLP ("BDO"), to determine a methodology for the distribution of Lipper Convertibles' assets upon its dissolution. BDO issued an initial report (the "BDO Report") in October 2002 and a follow-up report – with

6

variances not relevant to this appeal – in December 2003.[4] At the outset, the BDO Report cautioned that BDO "ha[d] not been asked to develop an opinion regarding whether the values of the securities contemporaneously reported in [Lipper Convertibles'] records were appropriate at any specific point in time." The report then proceeded to revalue Lipper Convertibles' securities on a month-by-month retrospective basis from January 1995 to November 2001 at prices lower than those contemporaneously reported by Lipper Convertibles. Joint App'x at 1686-87. The alternative values listed in the report were calculated based on securities pricing information provided by independent pricing services associated with the Financial Times Group and Merrill Lynch, as well as on brokerage statements from third-party brokers reflecting their contemporaneously reported pricing of certain of the securities.

In justifying the revaluations, the BDO Report explained that it was "fair and reasonable to obtain and utilize securities market prices [from 1995 through 2001] from the same types of reputable third party sources relied upon by [its] professionals when auditing hedge funds," Joint App'x at 1687, and that BDO had "employed a reasonable methodology of determining the investors'

---

[4] At times, we refer herein to the BDO Report and the follow-up report collectively as the "BDO Reports."

ownership interests in percentages and dollars as of June 30, 2002, without significant use of the 'market values' of the securities reported" in the records for the fund vehicles in which the plaintiffs had invested, Joint App'x at 1687. BDO calculated revised values for the hedge fund's total capital as well as each limited partner's ownership interest. Having determined that the fair value of the underlying securities had been overstated, BDO also concluded that there had been an overstatement of the Fund's total capital as well as the interests of the limited partners. Accordingly, for each year from 1995 through November 2001, BDO's analysis showed a difference between the Fund's contemporaneously reported total capital and BDO's alternative calculation of total capital of between 11 percent and 49.4 percent.

In October 2002 the Fund began liquidating its assets, and the general partner filed a petition in New York State Supreme Court for an order winding up the Fund and approving the distribution of $362 million in assets to limited partners in accordance with the revised ownership interests calculated by BDO. The subsequent state court proceedings, which included the appointment of a liquidating trustee, were described by the New York Court of Appeals when it reviewed various state claims against PwC arising out of a separate action

8

commenced by other limited partners of Lipper Convertibles in <u>Continental</u>

<u>Casualty Company v. PricewaterhouseCoopers, LLP</u>:

> In the spring of 2003, a Trustee was appointed, charged with, among other things, investigating and bringing claims against the former Fund managers, and any other culpable parties, on behalf of the limited partners who lost money as a result of the Fund's collapse. In July 2004, the Trustee commenced an action against PwC for damages allegedly caused to the Fund by PwC's improper audits. The Trustee alleged, among other things, that PwC was aware of the misstatements in the financial reports, but failed to bring them to the attention of the Fund's management, instead falsely representing that the financial statements were prepared in accordance with GAAP. Based on these allegations, the Trustee asserted causes of action for accountant malpractice, fraud, breach of fiduciary duty and breach of contract.

<u>Cont'l Cas. Co.</u>, 15 N.Y.3d at 268 (2010).[5]

In February 2004 the state lower court ordered the distribution of Lipper Convertibles' remaining assets to the limited partners in accordance with the analysis contained in the follow-up BDO Report, including the BDO Report's revaluations of Lipper Convertibles' securities. The plaintiffs supported the proposed distribution.

---

[5] In January 2010 the liquidating trustee settled with PwC, <u>Cont'l Cas. Co.</u>, 15 N.Y.3d at 268 n.*, for $29,978,000. Plaintiffs opted out of the settlement.

## 2. Strafaci's Guilty Plea

In August 2004, two years after leaving Lipper Convertibles, Strafaci pleaded guilty in the Southern District of New York to one count of securities fraud in violation of Section 10(b) based on the fraudulent overvaluations of Lipper Convertibles' securities. In effect, in determining the fair value of the Fund's securities, "Strafaci us[ed] market quotations from broker-dealers as his benchmark or starting point. [He] would adjust such market quotations based on his own judgment using various criteria. There was no formal or documented review within Lipper of his valuations." Joint App'x at 838 (plaintiffs' expert report) (footnote omitted). During the plea, Strafaci acknowledged that he had engaged in securities fraud in connection with the limited partnership interests in the Fund from 1996 to January 2002, the period of criminal misconduct alleged in the indictment against him:

> At various times during the period alleged in Count 1 of the indictment, within the Southern District of New York, and elsewhere, I knowingly and willfully and with the intent to defraud made untrue statements of material fact in connection with the purchase and sales of interests in the [Lipper Convertibles funds]. I knew that the Lipper Funds utilized the instrumentalities in interstate commerce in connection with the purchase and sale of these securities.

> During the period alleged in the indictment[,] I knew that audited financial statements were prepared by auditors and were mailed to investors. I also knew that the annual financial statements contained representations that the portfolio was valued based on a fair value methodology the amount that the funds could reasonably expect to receive upon -- expect to receive or receive for the securities upon the current sale. However, I deliberately did not use this methodology. Instead, the values that I assigned to the securities were higher because I valued them based on my estimate of what they would be worth at some point in the future.

Confidential App'x at 288.[6] Strafaci also admitted that he understood that his fraudulent overvaluations would affect the investment decisions of limited partners in the Fund.

## B. Procedural History

Both sets of plaintiffs filed virtually identical complaints in two separate actions that were eventually consolidated before the same District Judge in the Southern District of New York. The complaints alleged a variety of federal and state claims against PwC, Lipper Convertibles, Lipper Holdings, and other defendants. As against PwC, the sole appellee in this appeal, the plaintiffs

---

[6] Although the transcript of the plea allocution is contained in the parties' confidential appendix, the transcript was never sealed or the subject of any confidentiality order, and the fact of Strafaci's plea is in the public record.

11

alleged both claims on behalf of Lipper Convertibles, which they conceded were derivative, and claims on behalf of themselves that they were fraudulently induced to invest in Lipper Convertibles by PwC's annual auditor opinion letters. The plaintiffs ultimately agreed to dismiss the clearly derivative claims based on the liquidating trustee's action against PwC. As relevant to this appeal, then, the plaintiffs' remaining claims against PwC included claims under Section 10(b) of the Exchange Act and Rule 10b-5, as well as state law claims alleging common law fraud and negligent misrepresentation and malpractice. The plaintiffs insisted that these remaining claims were for injuries distinct from the injuries sustained by the Fund.

After discovery, PwC moved for summary judgment dismissing all of the plaintiffs' claims for two reasons. First, PwC argued that the plaintiffs lacked standing because their injuries were suffered in common with the other limited partners and therefore gave rise to derivative, rather than direct, claims. Second, PwC maintained that the plaintiffs had failed to submit evidence that PwC acted with the requisite scienter in issuing its auditor opinion letters.

In November 2010 the District Court granted PwC's motion for summary judgment and dismissed all of plaintiffs' claims. The court held that the plaintiffs

lacked standing because they had not demonstrated any injury distinct from the injury suffered by the Fund itself, rendering their claims derivative rather than direct. In doing so, the District Court pointed to the New York Court of Appeals' decision in Continental Casualty, which it described as "strikingly similar to the case at bar." In Continental Casualty, the New York Court of Appeals had held that "PwC was entitled to summary judgment" in a case brought by other limited partners in the Fund, and affirmed the dismissal of those "limited partners' claims as 'derivative in nature.'" The District Court observed that the plaintiffs in Continental Casualty "were required but failed 'to come forward with direct, distinct date-of-investment injuries' to support such a claim, i.e., 'portfolio valuations showing the amount of the claimed overvaluation of the portfolio on the day of their respective investments.'" Lewin v. Lipper Convertibles, L.P., 756 F. Supp. 2d 432, 438-39 (S.D.N.Y. 2010) (quoting Cont'l Cas. Co., 15 N.Y.3d at 271-72 (2010)).

Having concluded that the plaintiffs in the instant case lacked standing because their claims against PwC were similarly derivative, the District Court understandably did not address PwC's alternative argument about scienter. After the court denied their motion for reconsideration, the plaintiffs appealed.

13

## DISCUSSION

"We review a district court's grant of summary judgment <u>de novo</u>, viewing the evidence in the light most favorable to the non-moving party and drawing all inferences and resolving all ambiguities in its favor." <u>Gould v. Winstar Commc'ns, Inc.</u>, 692 F.3d at 157-58. We will affirm "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Denying summary judgment is required "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Gould</u>, 692 F.3d at 158 (quoting <u>In re Omnicom Grp., Inc. Sec. Litig.</u>, 597 F.3d 501, 509 (2d Cir. 2010)).

A. <u>Standing to Bring a Direct Claim under Section 10(b)</u>

To sustain a claim under Section 10(b) and Rule 10b-5, the plaintiffs must show "(i) a material misrepresentation or omission; (ii) scienter; (iii) a connection with the purchase or sale of a security; (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation." <u>Id.</u> (quotation marks and alteration omitted). Whether a party has standing to assert claims under Section 10(b) is a question of federal law. See <u>Drachman v. Harvey</u>, 453 F.2d 722, 727-28 (2d Cir.

1971), modified en banc on other grounds, 453 F.2d 722, 736 (2d Cir. 1972); In re Smith Barney Transfer Agent Litig., 765 F. Supp. 2d 391, 397 (S.D.N.Y. 2011). Shareholders generally lack standing to assert individual claims in their own name based on injury to the corporation and must instead bring such claims derivatively on behalf of the corporation.  See Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1101 (2d Cir. 1988).  Similarly, when the injured party is a limited partnership instead of a corporation, we have allowed the limited partners to bring direct claims alleging injury distinct to themselves, but required that claims alleging injury to the limited partnership be brought derivatively.  See, e.g., Lerman v. Tenney, 425 F.2d 236, 237-38 (2d Cir. 1970) (allowing limited partners alleging violation of Section 10(b) and Rule 10b-5 to bring direct claims alleging injury to themselves and derivative claims alleging injury to the limited partnership); Klebanow v. N.Y. Produce Exch., 344 F.2d 294, 297 (2d Cir. 1965) (finding a limited partner's standing analogous to a corporate shareholder's standing for purposes of distinguishing between direct and derivative suits under Section 4 of the federal Clayton Act).[7]  The same principle holds for limited

---

[7] See also Glusband v. Fittin Cunningham Lauzon, Inc., 582 F. Supp. 145, 149 (S.D.N.Y. 1984) (finding that plaintiff receiver had standing to bring Section 10(b) claims on behalf of the limited partnership but lacked standing to bring

15

partners under New York law, which applies to plaintiffs' state claims. See, e.g., Cont'l Cas. Co., 15 N.Y.3d at 270-72; Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F. Supp. 2d 385, 408-09 (S.D.N.Y. 2005).

Accordingly, the plaintiffs have standing to sue only for injuries distinct to themselves and not sustained in common with the other Lipper Convertibles limited partners.

### 1. PwC's Burden as the Moving Party

The moving party bears the initial burden of "showing that there [is] no genuine dispute as to a material fact." Vivenzio v. City of Syracuse, 611 F.3d 98, 108 (2d Cir. 2010). However, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009). "In that event, the nonmoving party must come forward with admissible evidence

---

"claims which belong solely to the limited partners" such as claims that the limited partners were fraudulently induced to purchase their limited partnership interests); Attick v. Valeria Assocs., L.P., 835 F. Supp. 103, 110-11 (S.D.N.Y. 1992) (finding a limited partner's standing analogous to a corporate shareholder's standing for purposes of distinguishing between direct and derivative suits under the federal RICO Act).

16

sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Id. Here the plaintiffs bore the burden of establishing that they have standing because their claims are direct rather than derivative. In the absence of a genuine dispute of material fact or of evidence presented by the plaintiffs on the issue, PwC would have been entitled to summary judgment.

Based on the affidavit of Dr. Chudozie Okongwu, the District Court concluded that PwC demonstrated an absence of a genuine dispute regarding plaintiffs' standing to bring a direct claim. The Okongwu affidavit, relying on the BDO Report, asserted that all of the damages claimed as part of the plaintiffs' federal and state causes of action were merely the plaintiffs' share of partnership losses and thus were derivative in nature: "The difference between the Plaintiffs' net capital investments and their June 30, 2002 capital balances, as calculated by the BDO model, are [sic] exclusively a function of three components, each of which accrued to Plaintiffs in common with the other limited partners in Lipper Convertibles over the course of their investment in [Lipper Convertibles], and none of which is unique to Plaintiffs or accrued at the moment of Plaintiffs' investment." The Okongwu affidavit identified the three components as (1) Lipper Convertibles' trading losses, (2) Lipper Convertibles' overpayments to

17

withdrawing limited partners, and (3) Lipper Convertibles' payment of inflated management and incentive fees to the general partner.

At oral argument on appeal, PwC indicated that it was arguing only that plaintiffs could not show that the fair value of the interests that plaintiffs purchased was fraudulently overstated at the times of plaintiffs' investments. That is, PwC conceded that if such a showing were made, then the plaintiffs would have a direct, rather than derivative, claim. Oral Arg. Tr. at 17. Pointing largely to the Okongwu affidavit, however, PwC contends that it presented evidence that the plaintiffs' interests were in fact not overvalued at the time of purchase and that other reasons common to all of the limited partners – including those whose claims were dismissed in Continental Casualty – explained the plaintiffs' losses. As a result, PwC maintains, the plaintiffs' injuries were no different from those suffered by other limited partners.

PwC clearly failed to satisfy its initial minimal burden of showing a lack of a genuine dispute about whether the plaintiffs' respective interests were overvalued at the times they were purchased. We arrive at this conclusion for two reasons. First, the Strafaci guilty plea allocution provided what appears to be direct evidence of the overvaluation of the securities underlying those

18

interests at all relevant times. Second, the BDO Report, which was part of the record on summary judgment and was cited by the parties, also provided some evidence that the relevant securities were overvalued in each year from 1995 through November 2001. Certainly in combination, the guilty plea allocution and the BDO Report provided evidence from which a jury reasonably could find that the plaintiffs purchased their interests at fraudulently overvalued prices.

### 2. The Strafaci Plea Allocution

We start with the more compelling evidence of Strafaci's plea allocution, which, it seems to us, supported the plaintiffs' claim that their interests in the partnership were overvalued at all relevant times, including the time of purchase. As part of his guilty plea to securities fraud, Strafaci stated that between 1996 and January 2002, in valuing the securities in Lipper Convertibles' portfolio, he "deliberately did not use" the fair value methodology that the financial statements represented was used. Instead, Strafaci stated, "the values that [he] assigned to the securities were higher because [he] valued them based on [his] estimate of what they would be worth at some point in the future." Strafaci also stated that he understood that his actions would "affect the decisions of persons engaged in transactions in securities of the fund." Put simply and in the light

19

most favorable to the plaintiffs, Strafaci, the principal trader in charge of valuing the securities, admitted that over the period during which the plaintiffs purchased their interests in the Fund, he consistently and systematically assigned higher values to the securities underlying those interests than were appropriate based on the methodology that Lipper Convertibles' financial statements represented was being used. The evidence of Strafaci's plea, moreover, was indisputably before the District Court on the summary judgment motion. For example, it was specifically referenced by the plaintiffs in their Rule 56.1 Counterstatement, and the District Court's opinion referred to the plea in a footnote.

We conclude that Strafaci's admission that he overvalued the securities during the period of time that the plaintiffs purchased their interests was sufficient to create a triable issue of fact as to whether the plaintiffs purchased their interests at an inflated price and thereby suffered a direct injury at the time of their investments.

### 3. The BDO Reports

As discussed, the BDO Report provided evidence that the relevant Lipper Convertibles securities were overvalued in each year from 1995 through

20

November 2001. Without disputing the revaluations of the relevant securities contained in the BDO Report, PwC argues that the District Court properly discounted the report on both procedural and substantive grounds.

We turn first to the procedural ground. The District Court faulted the plaintiffs for not designating specific parts of the BDO Reports in opposing summary judgment. Although the plaintiffs surely could have presented the evidence of the overvaluation of the securities more clearly to the District Court, their brief in opposition to summary judgment referenced the BDO Reports at some length as evidence of the overvaluation. To be sure, the District Court is not required "to scour the record on its own in a search for evidence" when the plaintiffs fail to present it. Archie Comic Publ'ns, Inc. v. DeCarlo, 258 F. Supp. 2d 315, 317 (S.D.N.Y. 2003) (quotation marks omitted). Nevertheless, we conclude that the court erred in disregarding the BDO Reports on that basis. First, neither the initial BDO Report nor the follow-up report was especially long; including a two-page cover letter, the initial report spanned just 19 pages, while the follow-up report was all of 16 pages and stated up front that it did not alter the initial report's retrospective monthly revaluations. Plaintiffs were not asking the District Court "to peruse a haystack looking for needles." Id. at 318. Second, the

21

report was central to the summary judgment record, as evidenced by the fact that it was cited repeatedly by the plaintiffs in opposing summary judgment and by the District Court itself in its opinion. The report was properly before the District Court as evidence that the plaintiffs had purchased their shares at inflated prices.

In the alternative, the District Court determined that the report substantively did not demonstrate that the plaintiffs overpaid for the relevant securities. The court held that the report failed to determine with precision the value of the relevant securities at any particular time of purchase. The District Court understandably arrived at this conclusion based largely on the report's disclaimer that BDO was "not . . . asked to develop an opinion regarding whether the values of the securities contemporaneously reported in [Convertibles'] records were appropriate at any specific point in time."

But we think the able and experienced District Judge placed too much emphasis on the disclaimer at this stage in the litigation. A jury could reasonably infer from the events following the issuance of the BDO Reports, as well as the methodology used in the reports, that the BDO valuations were both reliable and reflected contemporaneous pricing. First, the New York state court based its distribution of several million dollars entirely on the BDO Reports' alternative

22

valuations of the securities. A jury could reasonably infer that BDO's valuations were therefore sufficiently reliable measures during the relevant period. Second, whether or not BDO was "asked to develop an opinion" regarding the appropriateness of Convertibles' reported values, the BDO Reports functioned more or less as expert reports. A jury could reasonably conclude that BDO's methodology in revaluing the securities was sound and that its calculations were reliable even though they were not the primary purpose of the reports. Third, on a consistent basis, the month-to-month valuations contained in the report showed significant inflation, so that a jury reasonably could infer that the prices were inflated on the particular days that the plaintiffs purchased their interests.

Finally, at the summary judgment stage it was irrelevant that the valuations in the report failed to reflect the precise valuations of the securities on the particular purchase dates at issue. Such a level of precision was not required to defeat summary judgment for the simple reason that the amount of overstatement relates to damages, not liability. To defeat summary judgment, the plaintiffs merely had to establish a genuine dispute as to whether they purchased their shares at inflated prices, regardless of the amount of the inflation.

We therefore conclude that the BDO Reports, at least in combination with Strafaci's admission of overvaluation, sufficed to create a triable issue of fact. A reasonable jury could infer that the reports contained the more accurate prices of the relevant securities and that plaintiffs had purchased at least some of their limited partnership interests at prices that exceeded the prices listed in the reports.

In urging affirmance nevertheless, PwC continues to rely on the Okongwu affidavit, which challenged the import of the BDO Reports by stating that the Reports addressed only losses attributable to events taking place after plaintiffs' initial investments. The District Court asserted that the plaintiffs "simply den[ied] that [Okongwu's] opinions are correct" and that such a conclusory denial, without more, could not spare them from summary judgment in PwC's favor. In fact, however, the plaintiffs appear to have seriously disputed the relevance of Okongwu's opinion. Moreover, a jury would not be required to credit Okongwu's views concerning the import of the BDO Reports.

For example, the plaintiffs noted that Okongwu's central assertion – that all of their losses stemmed from trading losses or an overpayment to other limited partners or to the general partner – represented "a tautology, because the

24

BDO model, by definition, as applied by Okongwu on behalf of PwC, assumes no mispricing of [Lipper] Convertibles in the first place." Joint App'x at 2240 (Plaintiffs' response to PwC's Rule 56.1 Statement). The plaintiffs also argued that the Okongwu affidavit never disputed their claim that the purchase price of their interests in Lipper Convertibles was overstated.

The weight of the evidence is a matter for the factfinder at trial. In light of PwC's statements at oral argument, the only question presented to this Court is whether there was sufficient evidence to permit the conclusion that the prices at which plaintiffs purchased their partnership interests were overstated at the times of investment.[8] By embracing rather than repudiating the BDO Reports, the Okongwu affidavit accepted the calculations showing that the securities underlying the plaintiffs' limited partnership interests were consistently

---

[8] In Continental Casualty, the New York Court of Appeals faulted similarly situated plaintiffs asserting claims under state law for failing to "come forward with portfolio valuations showing the amount of the claimed overvaluation of the portfolio on the day of their respective investments" that would support a claim for "direct, distinct date-of-investment injuries" separate from the derivative claims that had been settled by the Fund's trustee. 15 N.Y.3d at 271-72. To the extent that Continental Casualty may be read to have required the plaintiffs there to prove the precise amount of the overvaluation to survive summary judgment, see id. at 274 (Read J., dissenting), we decline to impose that requirement as a matter of federal law. And unlike the New York Court of Appeals, we have no occasion to decide how the liquidation might have affected the nature of the injury.

25

overvalued.[9] Reviewing the evidence, again, in the light most favorable to the plaintiffs, we cannot reconcile the BDO Reports with PwC's insistence that the prices at which the plaintiffs purchased their interests remained entirely unaffected by the overvaluations.[10]

B. Scienter

Finally, PwC argues in the alternative that we should affirm the District Court's summary judgment on plaintiffs' Section 10(b) claims on the ground that there is no genuine dispute as to whether PwC acted with scienter, a required element of the Section 10(b) claims. As we have noted, the District Court did not address this argument.

Although "[w]e may affirm the award of summary judgment on any ground with adequate support in the record," VKK Corp. v. Nat'l Football League, 244 F.3d 114, 118 (2d Cir. 2001), whether to do so is purely discretionary, see No Spray Coal. v. City of New York, 351 F.3d 602, 606 (2d Cir. 2003) (declining to "venture to answer [a] complex question in the first instance" as an

_____

[9] Rather, the Okongwu affidavit suggested that any such overvaluation became immaterial as a result of the liquidation, which set aside the originally calculated ownership interests.

[10] Indeed, except for a footnote in its summary judgment reply brief, PwC did not seriously contend that there was a lack of evidence that the plaintiffs purchased their interests at inflated prices.

26

alternative ground for summary judgment and instead remanding to the district court). Here, the scienter issue is highly fact-intensive and will depend on an evaluation of expert witness reports and deposition testimony.[11] For example, the plaintiffs' expert concluded that "approximately 95% of Mr. Strafaci's valuations were higher than the prices or quotes obtained by PwC from independent sources" and that "the relative amounts and percentages of such valuation differences grew over time." He also explained that these facts "should have raised significant 'red flag[s]' with PwC as to possible bias or fraud on the part of [Lipper Convertibles'] management." Whether this and other evidence is enough for a reasonable jury to conclude that PwC knowingly or recklessly "failed to review or check information that it had a duty to monitor, or ignored obvious signs of fraud," is a question best addressed in the first instance by the

---

[11] "Plaintiffs may satisfy the scienter requirement by producing evidence of conscious misbehavior or recklessness" by PwC in auditing Convertibles' financial statements. Gould, 692 F.3d at 158 (quotation marks omitted). Conscious misbehavior means "deliberate[ly] illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." Id. (quotation marks omitted). "Scienter based on recklessness may be demonstrated where a defendant has engaged in conduct that was highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. at 158-59 (quotations marks and ellipsis omitted). "Recklessness may be established where a defendant failed to review or check information that it had a duty to monitor, or ignored obvious signs of fraud." Id. at 159 (quotation marks and alteration omitted).

27

District Court on remand. <u>Gould</u>, 692 F.3d at 159 (quotation marks and alteration omitted).

C. <u>State Law Claims</u>

Finally, as for the plaintiffs' state law claims, plaintiffs' counsel conceded at oral argument that those claims were properly dismissed under New York law based on <u>Continental Casualty</u>. Oral Arg. Tr. at 22-23. We affirm the grant of summary judgment as to the state law claims.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment of the District Court dismissing the plaintiffs-appellants' state law claims, VACATE the judgment of the District Court dismissing the federal claims under Section 10(b) of the Exchange Act, and REMAND the case for proceedings consistent with this opinion.